**UNITED STATES of America**

v.

**Frank RULLY, aka Frank Rulli.**

**Crim. No. 9158.**

United States District Court
D. Connecticut.

June 8, 1956.

See also 136 F.Supp. 881.

Simon S. Cohen, U. S. Atty., Henry C. Stone, Asst. U. S. Atty., Hartford, Conn., for plaintiff.

John M. Chapnick, Boris I. Bittker, New Haven, Conn., for defendant.

SMITH, Chief Judge.

Defendant, a professional gambler, garbage collector and pig raiser, convicted on trial to the Court of attempted income tax evasion in his joint return for 1949, moves in arrest of judgment or for new trial, and to amend the findings. The government also moves to amend the findings.

The motion of defendant to amend finding 7 is denied. It was testified, so far as the Court recalls, that the sole receipts from the sale of swine were those reflected therein.

The defendant's motion to amend findings 13, 16 and 35 is denied. The in-

ference appears justified in the absence of any contrary leads, and in the light of the testimony as to 'Mrs. Rully's activities at the farm, that other income of Mrs. Rully than from her identified investments not only was not proved, but did not exist. While the payments for the dinners may have been handled by Mrs. Rully to some extent, Larry's testimony that the profit was defendant's seemed credible, and is bolstered by defendant's statements to Kreger that he kept a record of his picnic income on a calendar. As to the Ford cars, it was the Court's recollection that the original Ford purchase was with defendant's funds. If so, the inference would be justified that the first Ford and those obtained by successive trade-ins were defendant's. The effect on the tax year in question is in any case not substantial.

The motion to amend findings 22 and 25 is denied. Although it may be that some of the payments on the house were delivered by Mrs. Rully to the contractor, and although title to the land was in her name and the family unit was expected to occupy it, the arrangements throughout were in charge of defendant and the obligation to pay and the payments his.

Both sides seek amendment of finding 38, the government seeking to eliminate the starting cash on hand item, the reference to unrepaid borrowings during the year, and the finding of no cash on hand at the end of the year, the defendant to eliminate reference to starting and closing cash or increase the starting cash figure and to increase the unrepaid borrowings figure. Defendant also seeks amendment of finding 39 to increase the amount of the borrowing in 1949, and seeks a finding of decrease in Mrs. Rully's net worth in accordance with the stipulation. The $17,000 figure for opening cash on hand is supported not only by defendant's statement given in 1950 of cash on hand in that amount in 1945, but by the corroborative evidence of the loan application of March 1949 contemplating a cash down payment of $15,000, and by the use of $16,000 cash and resort to the bank account for the balance at the time of the escrow agreement in May 1949.

The figure of 0 for cash on hand at the close of the year is not justifiable. Defendant was obviously low on cash because of his calling on various resources to raise cash by arrangements which were completed shortly thereafter. But he would hardly have made cash payment for the furniture if it completely denuded him of cash. The finding may be amended to show at least $2,000 cash on hand at the end of the year.

The requested additional finding of a decrease in Mrs. Rully's net worth in 1949 by $2,257.82 may be made.

■ Defendant's increase in net worth since the purchase of the farm in 1942 up to January 1, 1950 shows quite plainly that he did substantially understate income in his tax returns at some time in the intervening years. There may be civil liabilities for those years, especially since the investigation was under way as early as January 1950. This criminal prosecution, however, has to do only with the return for the calendar year 1949. In view of the apparent understatement over the period, the suspicion must be strong that the pattern was followed in the 1949 return. However, we may not convict on suspicion, and review of the evidence on these motions leads the Court to question whether there is sufficient evidence to base the amount found in findings 38 and 39 as to defendant's borrowings not repaid by the end of the year. Defendant claimed as early as January 1950 that such borrowings had been made. There is secondary evidence that he repaid some in early 1950. The witnesses, as is not surprising in view of defendant's main occupation, are often most untrustworthy. If the burden of proof of the amount of the borrowing was on the defendant, he has not sustained it. Yet the evidence of his borrowings and attempted borrowings in 1949 and 1950 is persuasive that some substantial amount was borrowed from a source other than a lending institution

in late 1949 and repaid from the proved sources of funds in early 1950.

The review of the findings points up the most troublesome problems in a net worth case where the amounts involved are relatively small. Questions regarding the burden of proof are raised by defendant relating to the Conforte loan, the capital gains deduction and Mrs. Rully's net worth decrease and interest income, and Mrs. Rully's resources. The ultimate burden is upon the government. Where there is evidence produced by the government of the nature of Mrs. Rully's activities, and her financial history, it is open to the trier to infer that no other sources of funds through her existed in the tax year in question in the absence of leads furnished by the taxpayer. The net worth decrease of Mrs. Rully is established by the stipulation. Her approximate interest income may be calculated from the evidence. As to the claimed capital gains deduction, there was some testimony that 65% of the swine sold were brood animals. This the Court did not credit. In the face of the failure of defendant to list any in his return and of the lack of any evidence as to his intent that they should be used for breeding purposes rather than for meat animals, the Court would not be justified in finding that any appreciable percentage, let alone 65% were animals on which defendant was entitled to capital gains treatment. The crucial question of the burden of proof on two major items basic to the finding of guilt remains.

The opening cash on hand and the Conforte loan present squarely the question of how far the defendant must go, in spite of the Fifth Amendment, to establish the nature and amount of non-taxable receipts during the year, as to which he has furnished leads to explain the net worth bulge in that year. He has in this case furnished such leads of which on checking, the government found some secondary evidence, but which evidence the government seeks to discredit by evidence of need for funds by defendant near the opening date, and lack of resources in the alleged lender at the time of the claimed loan. Defendant contends that having shown the possible source, the burden is still on the government to establish the amount. It need not do so, of course, to a mathematical certainty. Where, as here, the government has established the bulge, the trier may weigh all the evidence about the available source to which leads were given, and find the facts established by such evidence. If the government chooses to ignore a genuine lead, the trier cannot find that no sufficient funds came from that source. If the government follows up the lead and is unable to establish that a sufficient amount did or did not come from that source, it must at least show that it was not within the range of reasonable probability that sufficient funds came from that source to account for the apparent understatement of income. Cf. U. S. v. Costello, 2 Cir., 221 F.2d 668, 673. The Court found that it had not borne the burden on the issue of opening cash on hand, but had borne it on the insufficiency of amount of the claimed loan.

The Court's finding that the government has borne the burden here depends on the sufficiency of the underlying evidence from which it inferred that the amount of loans from other gamblers, not repaid in 1949 was approximately $10,000. Review of the evidence fails to support that finding as sufficiently well founded. We may distrust the evidence which was produced regarding the Conforte loan, but it is not open to dispute that Rully had been seeking bank loans to meet the house construction payments in 1949, as well as seeking money from other sources, and that he did obtain cash from some place when the bank loans were not forthcoming in 1949, and did manage to raise money from bank and other sources and from the family investments in early 1950 which could have gone to repay loans made in 1949. The amount of loans outstanding could have been higher than $10,000 and if it were as much as $8,500 higher it would have wiped out the proved understatement entirely. The government has not shown

that it was not within the range of reasonable probability that loans were obtained from other gamblers and that the amount was that large, in view of the testimony of the scale of the gambling activity of Conforte and defendant, and the evidence of defendant's transactions of late 1949 and early 1950. In the absence of such a showing, the findings are based on estimates without sufficient basis in the proof to establish guilt beyond a reasonable doubt. Review of the case on these motions to amend the findings leads the Court to the conclusion that it was incorrect in finding that it was established with sufficient certainty that no loans substantially in excess of $10,000 made in 1949 were outstanding at the close of the year. There remains a suspicion that gambling income in 1949 was higher then the amount reported in the guise of farm and picnic income, but this is not enough for conviction of attempted evasion of taxes for 1949, the only year in question in this case.

The findings of the amount of unreported income and unrepaid borrowings in 1949 are set aside.

The finding of guilty is set aside and a judgment of acquittal ordered.