**UNITED STATES of America,**

v.

**HOM MING DONG, Defendant.**

**No. C–17412.**

United States District Court
D. Arizona.

Dec. 6, 1968.

Morton Sitver, Asst. U. S. Atty., District of Arizona, for plaintiff.

Stockton & Hing, Henderson Stockton, Robert Ong Hing, Phoenix, Ariz., for defendant.

## OPINION

MUECKE, District Judge.

### STATEMENT OF THE ACTION

On February 25, 1966, the defendant Hom Ming Dong was charged in a six-count indictment with attempted income tax evasion (26 U.S.C.A. § 7201) for the taxable years 1959 through 1964 inclusive. Hom Ming Dong entered a plea of not guilty to all counts. A jury trial was waived and the case was tried to the Court.

A request having been made that the Court enter findings of fact and conclusions of law, this opinion shall answer that request as allowed by Federal Rules of Criminal Procedure, Rule 23(c).

## BACKGROUND AND FACTS

The defendant and his wife filed joint federal income tax returns in 1960 1961, 1962, 1963, 1964, and 1965 in the District of Arizona for the taxable calendar years 1959 through 1964 inclusive. Exs. 3 through 8. The allegations of attempted tax evasion in the six counts of the indictment were founded upon the tax returns filed by Hom and his wife.

During the taxable years 1959 through 1964 inclusive, Hom Ming Dong owned and operated Tom's Food Market located in a low-income area at 701 South 16th Street, Phoenix, Arizona. The market sold groceries of various kinds, meats, and alcoholic beverages. Mr. Hom and his wife, Carol Shaw Dong, lived in the rear of the store building together with their five children. For the years indicated, the defendant reported the following adjusted gross income and listed the following tax liabilities on his returns:

TABLE I (Source: Exs. 3–8)

| Years | Adjusted Gross Income Reported | Tax Liability |
|---|---|---|
| 1959 | $5,357.13 | $124.28 |
| 1960 | 4,901.29 | 47.00 |
| 1961 | 4,708.63 | 11.00 |
| 1962 | 4,685.00 | 2.00 |
| 1963 | 6,802.64 | 384.84 |
| 1964 | 7,648.32 | 420.95 |

The defendant paid the amount of the tax he reported as due in each of these years. Ex. 9.

Frank Edward Barndt, an Internal Revenue Agent assigned to audit Mr. Hom's 1962 returns, first met the defendant at Tom's Market on September 10, 1964, having telephoned the previous day to set up an appointment. Tr. p. 2. During the telephone conversation with Mr. Hom, Agent Barndt requested that the defendant make his records available, including his journals, check register, bank statements, and cancelled checks. Tr. p. 27. The only records made available was one small journal, which were not very detailed (Tr. p. 29), and some bank statements. The defendant also furnished copies of his 1961 and 1963 tax returns. When asked to explain how he made entries and how he computed income using the journal, he replied that he "just kept track." Tr. p. 30. At first, when asked for bank statements, Mr. Hom stated that he could not find them, but his accountant, Marvin E. Hamilton, who was present at the meeting, asked Mr. Hom whether he hadn't found some of them. Mr. Hom stated that he had and produced six bank statements for the year 1962. Tr. p. 30.

The only record of transactions kept by Mr. Hom, other than the bank statements, was the small journal. Barndt's preliminary audit showed that bank deposits exceeded the amount of income shown in the journal for the same period of time by approximately $30,000. Tr. p. 31. The income shown in the journal coincided with the amount shown on the 1962 tax return. Tr. p. 40.

The only record of daily transactions which Hom Ming Dong kept was the small journal referred to above. Ex. 66, pp. 4, 5. This journal was never entered into evidence nor marked for identification. The following description was given by Agent Brandt:

"It had an in column and an out column and as he explained it to me that the in showed the amount of cash that he had received during the day and that the out column was the amount of the number of expenses that he had made with a figure at the bottom showing his net profit or loss as the case may be for the day. The records, the book was not very detailed in that I could not verify a specific number. Let us say that there was an amount shown as an expense. I had no way of verifying what this expense was."

The unsworn statement of Hom Ming Dong taken in the office of the Internal Revenue Service on December 8, 1964, with Mr. Hom's attorney present and

placed in evidence as Government's Exhibit 66, includes the following dialogue:

"47. Q. Concerning your sales at the store, do you ring them all up on the cash register?

A. Every penny.

48. Q. Do you have a tape on the cash register?

A. My cash register has no tape.

49. Q. How do you get the sales at end of the day? How do you determine your sales—do you read the cash register at the end of each day?

A. I put $30.00 in change, then I ring up all my sales. At night I take my $30.00 out; all the rest is sales for that day.

50. Q. What about purchases? Are most of your purchases by check—most of them?

A. No.

51. Q. You have a lot of currency purchases?

A. It is rather hard to tell. Let's say this way—you're asking me how I pay those little bills and stuff now?

52. Q. Yes.

A. Some are paid by check; others paid by cash; and some of them are paid by check that I cash for the customers, so that's three ways paying.

53. Q. Do you know about how much of your total purchases is paid by either cash or customers' checks?

A. I have no breakdown, Mr. Bigler.

(Mr. Hing) I think Hamilton made some kind of a breakdown on that.

54. Q. At the end of the day do you write your sales down somewhere?

A. Yes.

55. Q. Where do you write it down?

A. I write it in a book." Ex. 66, pp. 4, 5.

In response to further questions regarding what books or records Mr. Hom had, he answered that there was very little space in his store and went on to say,

"I keep only limited records, and those I don't think absolutely necessary—I have to make room for my things and I don't keep those old records." Ex. 66, p. 5, q. 62.

This answer was given in response to questions concerning records for 1959 and 1960. Mr. Hom went on to say that three years was all that he kept his records. Ex. 66, p. 5, q. 61.

On November 12, 1964, Special Agent Lester A. Bigler of the Internal Revenue Service's Intelligence Division, contacted the defendant at Tom's Market. Tr. p. 134. Agent Barndt accompanied Agent Bigler to the store where they had a conversation with Mr. Hom. The defendant stated that he was represented by counsel, Mr. Hing, and that he would cooperate to whatever extent he was advised by his attorney but that he didn't care to answer any questions. Mr. Hom was requested by Agent Bigler to furnish all records he had pertaining to his income and expenses for the years 1959 through 1964. Mr. Hom replied that the decision was up to his attorney, whereupon the interview terminated. Tr. p. 136. Agent Bigler contacted Mr. Hom on at least one other occasion and the defendant refused to answer any questions.

The defendant was interviewed in the presence of his attorney on December 8, 1964, at an Internal Revenue Service Office in Phoenix, Arizona. The questioning was conducted by Special Agent Bigler. Agent Barndt and a court reporter were also present. The defendant stated that at the end of each day he would keep $30.00 cash for change on hand to start off the next day. Ex. 66, pp. 4 and 6.

The Government, by utilizing the net worth method of arriving at a tax lia-

bility, computed the following adjusted gross incomes and tax liabilities for Hom Ming Dong in the taxable years alleged in the indictment:

TABLE II (Source: Exs. 93 and 104)

| Count | Year | Adjusted Gross Income | Tax Liability |
|-------|------|----------------------|---------------|
| I     | 1959 | $21,197.42           | $3,919.23     |
| II    | 1960 | 27,064.61            | 5,988.55      |
| III   | 1961 | 19,324.38            | 3,357.31      |
| IV    | 1962 | 22,663.47            | 4,417.58      |
| V     | 1963 | 28,311.78            | 6,462.48      |
| VI    | 1964 | 19,206.73            | 2,961.82      |

Accordingly, the Government found that Hom Ming Dong had understated his adjusted gross income and his tax liability in the following amounts:

TABLE III (Source: Exs. 93 and 104)

| Count | Year | Understatement of Adjusted Gross Income | Understatement of Tax Liability |
|-------|------|------------------------------------------|---------------------------------|
| I     | 1959 | $15,840.29                               | $3,894.95                       |
| II    | 1960 | 22,163.32                                | 5,941.55                        |
| III   | 1961 | 14,615.75                                | 3,346.31                        |
| IV    | 1962 | 17,978.47                                | 4,415.58                        |
| V     | 1963 | 21,509.32                                | 6,078.04                        |
| VI    | 1964 | 11,558.41                                | 2,540.87                        |

In explanation of the rise in his visible assets, Hom Ming Dong told Agent Barndt that he had received a large amount of money from his father. However, he would not give a specific figure. Tr. p. 32. Later, at the time of the formal interview, the defendant stated he had "close to" $200,000 in 1947 when he came to Phoenix. This cash hoard allegedly consisted of $55,000 inherited from Mr. Hom's father in 1938, (Ex. 66, p. 7), and $130,000 which his wife had inherited from her parents in 1946 when they died in a cholera epidemic in Hong Kong. Ex. 66, p. 8.

Concerning the inheritance of Mr. Hom, the Government introduced in evidence a portion of a transcript of an interview held by the United States Immigration Department purporting to be with Mr. Hom's father, Hom Guen Fee, also known as Hom Chew Doon. Exs. 103 and 102. These exhibits (103, 102) were admitted by the Court solely for the purpose of showing what attempts the Government had made to check out leads as to the source of the defendant's alleged cash hoard. It was not admitted to prove the truth of the statements contained therein, only because the Court found that the foundation was not laid to prove that the Hom Guen Fee, also known as Hom Chew Doon, named in the interview was in fact the defendant's father.

The defendant's story concerning Mrs. Hom's inheritance of $130,000 was to the effect that her parents had died in a cholera epidemic in Hong Kong, China, and that Mrs. Hom's grandmother took control of the inheritance and saved it for Mrs. Hom. The defendant claims that his wife's parents were very wealthy merchants. Ex. 66, p. 8. Purport-

edly, the grandmother took a portion of the amount of money which the parents of Mrs. Hom left and gave the rest of it, $130,000, to Mrs. Hom. Then the grandmother took that portion of the money she had retained, left Hong Kong and returned to inland China to spend the rest of her life. Ex. 66, p. 8.

The dialogue between the defendant's attorney and Agent Bigler at the trial elicited the fact that Agent Bigler had written to the International Relations Department of the Internal Revenue Service which had in turn contacted their representative in the Hong Kong area and had obtained a marriage certificate for Hom Ming Dong and his wife (Ex. 86. Tr. pp. 375–376). However, Agent Bigler was unable to state affirmatively whether or not the Government had actually attempted to check out the story of the inheritance relative to Mrs. Hom's parents being wealthy merchants and dying in the cholera epidemic of 1945. Tr. pp. 373–376. Obviously, the Government is unable to communicate with or trace the grandmother who is in Communist China.

When Mr. Hom was questioned regarding the location of his $55,000 inheritance during the period that he was serving in the U. S. Navy, Mr. Hom stated that he had left the $55,000 with a friend named Mr. Eng. Ex. 66, p. 9. However, Mr. Hom did not know Mr. Eng's first name nor did he know where in San Francisco, Mr. Eng lived. Ex. 66, p. 10. Mr. Hom stated that he knew nothing about Mr. Eng, but that Mr. Eng had been recommended as an honest man and, therefore, he trusted him with his $55,000 cash. Ex. 66, pp. 16 and 10. The Government attempted to locate Mr. Eng but was unsuccessful. Tr. pp. 309–311.

Mr. Hom further stated that after he and his wife were married in Hong Kong in 1946, he returned to the United States with $100,000 in American currency in his sea bag. Ex. 66, p. 9. In an effort to verify the truthfulness or falseness of the statements regarding the sea bag, the Government obtained from the Bureau of Naval Personnel a list of officers and enlisted men who were serving with Mr. Hom at the time he was married in Hong Kong. Ex. 107. The Court admitted Exhibits 107, 108 and 108A for the purpose of indicating that the Government had attempted to check the leads given by defendant. Tr. pp. 346–351. The contents of the letters of reply received from the personnel serving aboard the USS KERMIT ROOSEVELT with Mr. Hom were not allowed into evidence on the basis of hearsay. Tr. pp. 347, 348.

In response to the question "Why didn't you put it (the money) in the bank?" Mr. Hom responded:

"I believe and my wife's belief I have to describe too different—I myself, even me, don't believe banks at first but agree I later learn that the bank that have insurance are safe place to keep money. Part of this money is my family's share. Between we both agree that I would have free will 'to do what my share was so I began to put some money in the bank. My wife is more objection to the bank than I am. She don't believe bank is safe until recent years that I reason her out. Keeping this money at home is risky against fire and theft perhaps, so I convince her that most banks nowadays have insurance and we should gradually put this money into the banks for the use of our children." Ex. 66, p. 11.

To refute the defendant's statement relative to his distrust of banks, the Government introduced evidence that the defendant had maintained a savings account in a Pioche, Nevada, bank as early as 1941 when he was approximately 18 years of age. Ex. 81. The Government also introduced evidence showing that Mr. Hom had a savings account in a San Francisco bank from August 20, 1945, to May 7, 1946 (Ex. 82) and another account in a San Francisco Bank from June 13, 1956, to July 11, 1960 (Ex. 83).

The Government's exhibits further show that the Homs began opening savings accounts in Arizona as early as 1951, which account had an opening deposit of $5000. Ex. 25. In 1952, the Homs opened another account with an initial deposit of $7000. Ex. 16. By the end of 1954, the Homs had opened five savings accounts in Arizona banks with initial deposits in excess of $24,000. Exs. 12, 14, 16, 25, and 27.

The Government in its effort to further discredit the defendant's story of a cash hoard introduced evidence that the defendant had purchased his store on a conditional sales contract (Exs. 63, 64); and had purchased various equipment on conditional sales contracts (Exs. 70 thru 80); and that Mr. Hom had cashed twenty-eight United States Savings Bonds in 1946 prior to their maturity date. Ex. 52.

The testimony of various character witnesses was to the effect that Mr. Hom was a law-abiding citizen who sent his children to church regularly and provided an excellent education for them, and that both he and his wife seldom, if ever, went out socially and that Mr. Hom was a hard-working, industrious individual. Tr. pp. 699–719, 734–738, 738–739, 739–740, and 740.

## CONCLUSIONS

*Net Worth Method of Proof:*

The prosecution was based on the net worth method of proof, which method has been approved by the United States Supreme Court. United States v. Johnson (1943) 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546; Holland v. United States (1954) 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150.

■ The basic elements to be proven in the net worth method are (1) the lack of adequate records, (2) the beginning and ending net worth of the taxpayer for each period involved, and (3) a likely source income that would be taxable. The Supreme Court in Holland v. United States, supra, described a typical net worth prosecution:

"In a typical net worth prosecution, the Government, having concluded that the taxpayer's records are inadequate as a basis for determining income tax liability, attempts to establish an 'opening net worth' or total net value of the taxpayer's assets at the beginning of a given year. It then proves increases in the taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net values of the taxpayer's assets at the beginning and end of each of the years involved. The taxpayer's nondeductible expenditures, including living expenses, are added to these increases, and if the resulting figure for any year is substantially greater than the taxable income reported by the taxpayer for that year, the Government claims the excess represents unreported taxable income. In addition, it asks the jury to infer willfulness from this understatement, when taken in connection with direct evidence of 'conduct, the likely effect of which would be to mislead or to conceal.' Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418." 75 S.Ct. at p. 130.

■ The evidence in this case shows that the taxpayer's records were inadequate as a basis for determining income tax liability and, therefore, the net worth method of proof is proper. Holland v. United States, supra.

The records of Mr. Hom were inadequate in that: (1) no cash register tape was used to record daily sales; (2) all cancelled checks were not available; (3) the purchases of merchandise for cash or by third-party checks were not recorded and are therefore unknown; (4) the only transaction journal known to have been in existence was not made available to the Government; (5) the method of computing daily sales was completely inadequate; and (6) Mr. Hom destroys all records over three years old. Tr. pp. 30, 34, and 721–725; Ex. 66, pp. 4–6.

*Establishing Taxpayer's Net Worth:*

The greatest hurdle facing the Government was the establishment of the taxpayer's net worth at the beginning and end of each year. In the case presently before the Court, the Government computed the following adjusted opening and ending net worth for the periods covered by the indictment: (Exhibit 93)

### TABLE IV
#### Net Worth

| Year | Opening | Closing | Increase* |
|------|---------|---------|-----------|
| 1959 | $115,421.82 | $135,592.41 | $20,170.59 |
| 1960 | 135,592.41 | 161,762.46 | 26,170.05 |
| 1961 | 161,762.46 | 180,184.55 | 18,422.09 |
| 1962 | 180,184.55 | 204,618.93 | 24,434.38 |
| 1963 | 204,618.93 | 234,170.81 | 29,551.88 |
| 1964 | 234,170.81 | 254,252.63 | 20,081.82 |

* The increase in net worth shown in this table does not correspond to the adjusted gross income shown in Table III because federal income taxes and self-employment taxes paid, payments of life insurance premiums, and bank drafts sent to Hong Kong were included in the adjusted gross income figure but not in the increased net worth figure.

In arriving at the opening and closing net worth figures the Government included cash in banks, U. S. savings bonds at cost, merchandise inventory, depreciable assets, federal income taxes, and self employment taxes paid, life insurance premiums and bank drafts sent to Hong Kong (Ex. 93). The evidence of the 26 savings accounts utilized and controlled by Mr. Hom is undisputed, as are most of the other assets. There is some dispute concerning the value of Mr. Hom's merchandise inventory, but in the Government's computations (Ex. 93) it used the merchandise inventory figures given by Mr. Hom in his income tax returns.

The Government established the taxpayer's opening net worth of $115,421.82 for the period starting January 1, 1959. This consisted of bank account balances of $13,541.73 (Ex. 26), $10,976.32 (Ex. 28), $181.52 (Ex. 13), $14,345.94 (Ex. 15), $15,719.53 (Ex. 17), $10,273.38 (Ex. 29), $10,274.58 (Ex. 36). He also had United States Savings Bonds valued at $13,250.00 (Ex. 53), merchandise inventory as listed on his tax return of $2,550.80 (Ex. 3), and depreciable assets valued at $25,353.94 on his return, making a total of $126,835.79 in assets. Subtracted from this are total liabilities of $11,413.97 which are comprised of $9,091.71 in accumulated depreciation (Exs. 3–8) and $2,322.26 accumulated interest on trust accounts with his children (Exs. 28, 30, and 37; Ex. 100 entered for illustrative purposes). Thus, the defendant's net worth as of January 1, 1959, was $115,421.82.

The defendant-taxpayer attempted to show the Government's starting net worth figure of $115,421.82 was arbitrary and unreasonable. The defendant's challenge to the 1959 starting net worth figure was predicated on the fact that the Government had allowed only the $210 currency deposited on January 8, 1959 (Ex. 19) as part of the cash on hand on January 1, 1959. Tr. pp. 376–377. The defendant contended there was no showing by the Government that the $3,549.37 worth of checks deposited at the same time was not currency on January 1, 1959 and, therefore, the amount of cash on hand was incorrect and the starting net worth figure was unreasonable and arbitrary. Tr. pp. 376–380. This same line of reasoning was direct-

ed at the other starting net worth figures also. Tr. pp. 380–390 and 742–753.

Based upon the entirety of the evidence we do not find the Government's starting net worths unreasonable or arbitrary. However, even if we were to accept the defendant's contention and determine that the amount of the checks deposited on January 8, 1959 should be considered cash on hand as of January 1, 1959, the Government's figures would, to our mind, be established to a reasonable certainty and the unreported taxable income would still be substantial. Holland v. United States, supra.

The *Holland* case does not require that the opening net worth be proven to a mathematical certainty (Holland v. United States (1954), 348 U.S. at page 138, 75 S.Ct. at page 137) but rather that the opening net worth be established with reasonable certainty (Holland v. United States (1954) 348 U.S. at page 132, 75 S.Ct. at page 135). In the later case of Banks v. C.I.R. (8th Cir. 1963) 322 F.2d 530, the Court said:

> "Some error in any net worth construction is perhaps to be expected. It is only a 'reasonable certainty' which is required by Holland and its companion cases." Banks v. C.I.R., supra, at page 548.

In the *Banks* case, the Appellate Court was confronted with the situation of having the commissioner make no allowance for cash on hand in his net worth reconstruction at any time during the net worth period but having the tax court find that Banks, in fact, had approximately $60,000 cash on hand at the beginning of the period. Banks v. C.I.R., supra, at page 538. Regardless of this finding, however, the tax court in the *Banks* case found the defendant guilty and was upheld by the Appellate Court which said,

> "We are fully satisfied that there was reasonable certainty here; that the opening net worth statement was not prejudicial or arbitrary; * *." Banks v. C.I.R., supra, at page 548.

*Investigating Taxpayer's Leads:*

The most critical challenge to the Government's opening net worth figure is the defendant's claim that he had close to $200,000 when he came to Phoenix. Ex. 66, p. 7. As previously discussed, Mr. Hom stated that his cash hoard was the result of the inheritances of both he and his wife. Ex. 66, pp. 7–9.

The Government introduced no direct evidence to dispute the existence of Mr. Hom's cash hoard. Rather it relied on the inferences that could be drawn from the history and activities of Mr. Hom as was done in the *Holland* case. Holland v. United States (1954) 348 U.S. 121, 133, 75 S.Ct. 127, 134.

Mr. Hom contended that initially neither he nor his wife trusted banks. Ex. 66, pp. 11–12. This contention was buttressed by the testimony of Mr. C. T. Huang, who is of Chinese ancestry and the branch manager of Bank of America, Chinatown Branch, San Francisco, California. Tr. p. 207. Mr. Huang testified on cross-examination that based on his three and one-half years of intimate contact with immigrant Chinese,

> " * * * [I]t is their (immigrant Chinese) general feeling that they don't trust the bank, in China, here." Tr. p. 217.

Mr. Hom said that finally after many years he and his wife were convinced that banks were safer than their home. Ex. 66, p. 11. Thereafter, Mr. Hom began dribbling his cash hoard into bank accounts so that people would not become suspicious and rob him at his store and home. Tr. p. 33, Ex. 66, pp. 11–12. The apparent method used by Mr. Hom to get the cash hoard into the banks was to cash checks for customers and to then deposit the checks. Ex. 66, pp. 11–12.

The statements and actions of Mr. Hom are inconsistent, improbable and undermine the creditability of his testimony. On the one hand, Mr. Hom says he is afraid that people will know he has money, but yet, on the other hand, he

cashed an increasing number of checks, some so large he used $100 bills to cash them. Ex. 66, p. 12. Logically, it would seem that fewer people would learn of his cash hoard if he deposited it in banks than would learn of it by his cashing so many checks.

As previously discussed, the Government attempted to track down Mr. Hom's leads, slim as these were, relative to Mr. Eng's holding the $55,000 inheritance, the distrust of banks, and the sea bag containing $100,000 in American currency. It was obviously impossible to reach Mrs. Hom's grandmother in Communist China. Therefore, we find that the Government did all it could reasonably be expected to do in investigating the leads provided by Mr. Hom. Holland v. United States, supra.

Following the decisions of the United States Supreme Court in Holland v. United States (1954) 348 U.S. 121, 133, 75 S.Ct. 127, 134, and the Circuit Court cases of Baumgardner v. C.I.R. (9th Cir. 1957) 251 F.2d 311, and Banks v. C.I.R. (8th Cir. 1963) 322 F.2d 530, this Court finds that Mr. Hom's contention of a cash hoard of $200,000 has been disproven by the aggregate of the Government's evidence and that the opening and ending net worths have been established to a reasonable certainty.

*Likely Source of Taxpayer's Income:*

The defendant in his various briefs and arguments has stressed the point that Mr. Hom's store could never make the amount of money necessary to provide for the increased net worth found by the Government. However, the Ninth Circuit in Whitfield v. United States of America (9th Cir. 1967) 383 F.2d 142, stated:

"In Holland, the Supreme Court remarked, 'Also requisite to the net worth method is evidence supporting the *inference* that the defendant's net worth increases are attributable to currently taxable income.' 348 U.S. 137 [75 S.Ct. 127]. (Emphasis supplied). It added, 'But proof of a like-

ly source, from which the jury *could reasonably find* that the net worth increases sprang, is sufficient.' 348 U. S. at 138 [75 S.Ct. 127]. (Emphasis supplied)." 383 F.2d at page 144.

It is not incumbent upon the Government to show all sources of income. It is sufficient to prove a likely source from which it can be reasonably found that the net worth increase was derived. Feichtmeir v. United States, 389 F.2d 498 (9th Cir. 1968). In the presentation of its evidence of a likely source of income which should have been reported, the Government has met the burden required by the *Holland, Feichtmeir,* and *Whitfield* cases.

The store was open seven days per week. Tr. pp. 708–711; Ex. K. There was no record of the purchases of inventory stock made by cash or third-party checks. The only records of inventory were those shown on the income tax returns or the figures given to Mr. Hamilton by Mr. Hom. There is no evidence of an independent audit of any kind. The defendant makes much ado about the financial statement prepared by Mr. Hamilton for the year 1964. However, the testimony of Mr. Hamilton was to the effect that the statement was prepared from information given by Mr. Hom after the investigation had begun (Tr. pp. 155–157) and that he, Mr. Hamilton, made no independent examinations (Tr. p. 178).

There was testimony from various defense witnesses to the effect that a neighborhood grocery store could not produce such an income. Tr. pp. 620 and 683. However, considering the fact that the store was open such long hours, that little or no money was spent for advertising or additional employees (Tr. p. 154, Ex. 67), that a high mark-up is inherent to neighborhood grocery stores (Tr. pp. 617, 619 and 698), particularly those selling liquors, and that the amount of checks cashed would indicate a substantial amount of foot traffic, this Court is of the opinion that the store was the likely source of income.

Although the Court permitted various individuals to express their opinions as to the income that the defendant might have derived from his store, there was no showing made that the opinion accurately reflected a true or actual knowledge of the operation, sales, income, overhead, and any other information that would provide the foundation necessary to give such opinions weight and creditability.

The Government having established the likely source of taxable income which was unreported, and the failure to keep adequate records which concealed the actual income, this Court infers a willfulness to defraud the Government of taxes rightfully owing, and finds Hom Ming Dong guilty on each of the six counts of the indictment as charged. Holland v. United States (1954) 348 U.S. 121, 75 S.Ct. 127; Spies v. United States, 317 U.S. 492, 63 S.Ct. 364.