**UNITED STATES of America,
Appellee,**

v.

**HOM MING DONG, Appellant.
No. 23940.**

United States Court of Appeals,
Ninth Circuit.

Jan. 18, 1971.

Henderson Stockton (argued), of Stockton & Hing, Phoenix, Ariz., for appellant.

Morton Sitver (argued), Asst. U. S. Atty., Richard K. Burke, U. S. Atty., Phoenix, Ariz., for appellee.

Before BARNES, DUNIWAY and ELY, Circuit Judges:

BARNES, Circuit Judge:

Appellant was indicted in 1966 by a federal grand jury on six counts of tax evasion in violation of 26 U.S.C. § 7201. He waived his right to a jury trial and was found guilty by the trial judge on all six counts of the indictment.[1] Sentence of a fine of $1,000 for each count was imposed and this appeal followed. Our jurisdiction rests upon 28 U.S.C. § 1291.

## I. Facts.

Appellant, a United States citizen by virtue of his father's citizenship, came to this country in 1938. He was inducted into the United States Navy and, during a tour of duty in the Pacific, was married in Hong Kong. Appellant and his wife came to the United States in 1946 and settled in Phoenix in 1947. In 1948, he purchased a grocery facility, which he has operated since that date under the name of Tom's Grocery Store.

In September, 1964, appellant was contacted by the Internal Revenue Service in Phoenix and asked to make his business records available for inspection. At a meeting with agent Frank Barndt, appellant, who was accompanied by his accountant, produced one small undetailed journal and several bank statements from the year 1962 for which agent Barndt was doing an audit. Although other bank statements were made available to the IRS, no other records of the business of the grocery were produced.

The agent's preliminary audit showed that (1) appellant's bank deposits exceeded the amount of income reflected in the journal by $30,000; (2) the income shown in the journal coincided with the amount reported on appellant's 1962 federal income tax return. In an attempt to explain the discrepancy between the bank deposits and his reported income, appellant stated that he had inherited a large sum of money from his father and that he originally did not trust banks, and had slowly deposited it in his banking accounts so as not to arouse suspicion of his wealth.[2] No other source was mentioned and the appellant would not state the specific amount of the inheritance from his father.

At a later interview at the Phoenix office of the IRS on December 8, 1964, appellant, who was accompanied by counsel, explained that his wife had inherited over $100,000 in American money after

---

1. The Opinion of the trial court is reported at 293 F.Supp. 1249 (D.Ariz.1968).

2. Appellant's first meeting with the IRS was recounted under direct and cross-examination by agent Barndt. (R.T. 30–42).

the death of her parents in Hong Kong. He claimed that he had brought this sum of cash to the United States in a seabag just before he was discharged from the Navy in 1946. He also reiterated his explanation that he had received an inheritance—specifically $55,000—from his father in 1938, which he had entrusted to a Mr. Eng in San Francisco while he was serving in the Navy. However, he could not remember Eng's first name nor his address. It was appellant's contention, on the basis of the foregoing explanation, that he had come to Phoenix in 1947 with almost $200,000 in cash, which he had slowly deposited in his checking and savings accounts. · ·

■ On the basis of information from appellant concerning the day-to-day operation of Tom's Grocery Store and other information concerning his visible assets in the form of bank accounts, savings bonds and depreciable assets, a computation of approximate yearly income was made by the "Net Worth and Expenditures Method." In using the net worth method of computation for estimation of yearly income, it is essential to establish an accurate net worth approximation at the beginning of the period for which the calculation is made. The IRS computed appellant's net worth on January 1, 1959 by aggregating the value of all his known assets including bank account balances, savings bonds, merchandise inventory and depreciable assets. (Ex. 3, 13, 15, 28, 29, 36, 53). In so doing they arrived at a starting figure of $115,421.82, which represented

appellant's total net worth on January 1, 1959. They then computed appellant's net worth in each succeeding taxable year from 1959–1964 in the same manner.[3] By subtraction they approximated appellant's increase in net worth for each year.

Through this method of computation the IRS determined that appellant's income had been understated in the following amounts:

| Year | Understatement of Adjusted Gross Income | Understatement of Tax Liability |
|---|---|---|
| 1959 | $15,840.29 | $3,894.95 |
| 1960 | 22,163.32 | 5,941.55 |
| 1961 | 14,615.75 | 3,346.31 |
| 1962 | 17,978.47 | 4,415.58 |
| 1963 | 21,509.32 | 6,078.04 |
| 1964 | 11,558.41 | 2,540.87 |

The six count indictment was based on this table.[4]

## II. The Findings and Conclusions of the District Court.

At trial appellant attempted to prove that this grocery business could not possibly have been the source of the sharp increases in his net worth, which were reflected in the government's computations. Two grocery store owners in the vicinity testified that the net rate of return on operations similar to appellant's could not exceed 7–10% of gross sales.[5] However, neither of the witnesses based their testimony on actual knowledge of the operation of appellant's grocery.

3. The government determined that appellant's net worth at the end of 1964 was approximately $290,744.29, an increase of over $185,000 from the 1959 figures.

4. The following tables reflecting information gathered from appellant's income tax returns were also compiled during the investigation of appellant's financial activities for the years in question.

| Year | Reported Adjusted Gross Income | Correct Adjusted Gross Income |
|---|---|---|
| 1959 | $5,357.13 | $21,197.42 |
| 1960 | 4,901.29 | 27,064.61 |
| 1961 | 4,708.63 | 19,324.38 |
| 1962 | 4,685.00 | 22,663.47 |
| 1963 | 6,802.46 | 28,311.78 |
| 1964 | 7,648.32 | 19,206.73 |

| Year | Reported Tax | Correct Tax |
|---|---|---|
| 1959 | $124.28 | $3,919.23 |
| 1960 | 47.00 | 5,988.55 |
| 1961 | 11.00 | 3,357.31 |
| 1962 | 2.00 | 4,417.58 |
| 1963 | 384.44 | 6,462.48 |
| 1964 | 420.95 | 2,961.82 |

5. One of the witnesses, Gene Ong, testified that the gross sales from his own grocery had never exceeded "60 some thousand dollars a year" (R.T. 731) during the periods for which appellant was being prosecuted.

Earl Nass, Field Director of Retail Grocers Association of Arizona, testified that in his opinion appellant's sales figures (Ex. F) were "About right. Knowing the other stores in these areas." (R.T. 601) However, his further testimony showed that he had little actual knowledge of appellant's grocery operation. Appellant's accountant testified that appellant had explained the disproportionate increases in his bank accounts by stating that he cashed customers' checks with funds that were not connected with the business.

In an attempt to discredit appellant's alleged fear of banks, the government introduced evidence showing that appellant had numerous savings accounts dating back[6] as far as 1941; that defendant had purchased his store and equipment on conditional sales contracts; and that he had cashed twenty-eight United States Savings Bonds in 1946, which was prior to their maturity dates.

The government also introduced evidence of its attempts to verify appellant's explanation of the source of his greatly increased net worth. It was shown that the government had checked the immigration records concerning the wealth of appellant's father when he had entered the country. Moreover, there was evidence that inquiries had been made of fellow servicemen of appellant on the ship that brought him to the United States when he allegedly returned from Hong Kong with $100,000 hidden in his seabag.[7]

The trial judge found that the inadequacy of appellant's records made appropriate the use of the net worth method of computation, as approved by the Supreme Court in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). He also found the net worth computation for each of the years in question, including the base figure for

January, 1959, to be accurate. He found the government had pursued the leads concerning the taxpayer's explanation of his wealth with due diligence. Furthermore, he found that the actions of appellant in cashing numerous checks and holding large savings accounts cast doubt on the credibility of his testimony.

The trial court concluded that the government had established a likely source of income from which increases in net worth could reasonably be inferred. As to the opinion evidence proffered by appellant, the court was of the opinion that:

"There was no showing made that the opinion accurately reflected a true or actual knowledge of the operation, sales, income, overhead, and any other information that would provide the foundation necessary to give such opinions weight and creditability [sic]." (C.T. 115)

Viewing all the evidence before it, the trial court concluded that·

"The Government having established the likely source of taxable income which was unreported, and the failure to keep adequate records which concealed the actual income, this Court infers a willfulness to defraud the Government of taxes rightfully owing, and finds Hom Ming Dong guilty * * *" (C.T. 115)

### III. *Issues on Appeal.*

 We think it clear from the evidence that the inadequacy of the appellant's business records made a net worth computation the appropriate method of determining the accuracy of appellant's federal tax returns. Holland v. United States, *supra* at 125, 75 S.Ct. 127, 99 L.Ed. 150. Moreover, we think that the absence of business records established willfulness if the following evidentiary legal issues are resolved against the ap-

---

6. By the end of 1964, appellant and his wife had five savings accounts in Phoenix banks with initial deposits in excess of $24,000. (C.T. 106)

7. In all fairness, it should be noted that it is probably doubtful that appellant would have communicated the fact of his possession of such a large amount of money to anyone else on the ship.

pellant as we hold they must be. *First,* was there sufficient evidence to prove a likely source of income from which it could reasonably be inferred that appellant's increase in net worth arose? *Second,* did the government establish that it had diligently investigated leads supplied by the appellant concerning his explanation of the nontaxable source of increase in his net worth? We think the government met its burden on both issues and thus we affirm the decision of the trial court.

A. *Appellant's Grocery Store Was A Likely Source of Income From Which It Could Be Inferred That His Increase In Net Worth Arose.*

In recognizing the necessity for applying the net worth method of computation with great care in Holland v. United States, *supra,* the Supreme Court, nonetheless, stated the fundamental policy for approving its continued use:

"One basic assumption in establishing guilt by this method is that most assets derive from a taxable source, and that when this is not true the taxpayer is in a position to explain the discrepancy." 348 U.S. at 126, 75 S. Ct. at 130, 99 L.Ed. 150.

In Whitfield v. United States, 383 F.2d 142 (9th Cir. 1967) we discussed the standard for proving a likely source of income:

"In *Holland,* the Supreme Court remarked, 'Also requisite to the use of the net worth method is evidence supporting the *inference* that the defendant's net worth increases are attributable to currently taxable income.' * * * (Emphasis supplied [by the court]) It added, 'But proof of a likely source, from which the jury *could*

*reasonably find* that the net worth increases sprang, is sufficient. * * * (Emphasis supplied [by the court]) From the emphasized words, it seems clear to us that in the presentation of its evidence of a likely source of income which should have been reported, the Government met the burden required by *Holland.* In defense, the appellant, who testified in her own behalf, contended that her business was incapable of producing the income which the Government charged to have been unreported. She insisted that her husband had concealed $100,000 in a tin box and that, upon his death in 1948, the money had come into her possession. Her credibility was severely shaken." 383 F.2d at 144.

See also Armstrong v. United States, 327 F.2d 189, 194 (9th Cir. 1964).

The trial judge found it significant that neither of appellant's witnesses had any direct knowledge of the operations of appellant's grocery. It is clear from his opinion that he thought their testimony did not negate the reasonable inference that was established by the government that appellant's net worth increased as a result of the grocery operations.

Moreover, the court was impressed with the weakness of appellant's explanation of the rapid increase in net worth. This undoubtedly gave added weight to the circumstantial evidence that the increase in net worth sprang from the grocery.[8] We agree with the reasoning of Moore v. United States, 271 F.2d 564, 568 (4th Cir. 1959) as quoted in United States v. Mancuso, 378 F.2d 612, 617 (4th Cir. 1967) in which the government's net worth computation was upheld as resting upon substantial evi-

---

8. In the case of Kasper v. United States, 225 F.2d 275, 278 (9th Cir. 1955) this Court addressed itself to a similar factual situation:

"The government, in the instant case, established that appellant was in an income-producing business. We must assume from the jury's verdict that they

did not believe appellant's story that he came to Fresno in 1942 with $40,000 that he had received in cash from his mother and from professional fees, which he had kept hidden in a hollow tile in his cellar; and that, accordingly he did not have such a cash reserve to start with."

dence[9] and negating the cash hoard theory beyond a reasonable doubt.

This, even though it has been said:

"If [circumstantial evidence] be sufficient to support an inference of guilt and the defendant fails to offer a reasonable explanation consistent with innocence, such failure may be considered by the trier of fact. * * It is not necessary, in appraising the sufficiency of the evidence, that this court be convinced beyond a reasonable doubt of the guilt of the defendant. * * * The question is whether the evidence, construed most favorable for the prosecution, is such that a jury (or trial judge) might find the defendant guilty beyond a reasonable doubt." Moore v. United States, *supra*.

■ Viewing the evidence in the light most favorable to the government, as we must (Lustiger v. United States, 386 F.2d 132 (9th Cir. 1967), cert. den. 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142), we do not think the trial judge erred in inferring that the increase in net worth was attributable to the grocery store, a likely source of the unreported income (293 F.Supp. at 1257).[10]

B. *The Government Made Reasonable Efforts To Investigate Appellant's "Cash Hoard" Explanation of Increased Net Worth.*

The Holland opinion recognized that the net worth method of tax computation, resting as it does on circumstantial evidence and approximation, might create the danger

"That the jury may assume that once the Government has established the figures in its net worth computations, the crime of tax evasion automatically follows." 348 U.S. at 127–128, 75 S.Ct. at 131, 99 L.Ed. 150.

To lessen this danger, the *Holland* court placed the burden upon the government to investigate leads given by the taxpayer as to nontaxable sources of increased net income. Specifically, the Court said:

"When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down *relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked*, which, if true, would establish the taxpayer's innocence." 348 U.S. at 135–136, 75 S.Ct. at 135, 99 L.Ed. 150 [Emphasis added.]

We think the government did all it reasonably could have been expected to do in checking the leads given by appellant, which were, at best, sketchy. We think this is particularly true in view of appellant's explanation of his increase in net worth. The *Holland* opinion specifically referred to the "cash hoard" defense as a favorite in net worth cases.

"This favorite defense asserts that the cache is made up of many years' savings which for various reasons were hidden and not expended until the prosecution period. Obviously, the Government has great difficulty in refuting such a contention." 348 U.S. at 127, 75 S.Ct. at 131, 99 L.Ed. 150.

■■ Although the use of such an explanation does not relax the requirement that the government investigate all leads pertaining to the existence of undeposited cash reserves, it does seem to place at least a minimal burden upon the taxpayer, once he chooses to furnish leads to the government, to aid in the

---

9. Compare United States v. Rully, 143 F. Supp. 283 (D.Conn.1956) (acquittal ordered on basis of insufficient evidence).

10. Since we find against the appellant on the issue of likely source of income, we need not discuss the issue raised in his reply brief that the government conceded that appellant had no other source of income besides the grocery store. (Ap.Rep. Br. 1)

investigation of the purported nontaxable source. As is clear from the earlier discussion, the appellant, who was in the best position to do so, gave little useful information to the government. We think the trial judge rightly concluded that the government did all it could under these circumstances.

The decision of the district court is affirmed.