Eugene F. Snyder and Leah Snyder v. Commissioner.
Snyder v. Commissioner
Docket No. 3752-66.
United States Tax Court
T.C. Memo 1969-173; 1969 Tax Ct. Memo LEXIS 122; 28 T.C.M. (CCH) 856; T.C.M. (RIA) 69173; August 25, 1969, Filed *122 Petitioner and his wife emigrated to this country from Europe just prior to World War II. Petitioner was a successful physician in Europe and claimed that he and his wife brought a substantial sum of money with them when they left Europe. During the years 1961-1963, the three years in issue, petitioners' professional activities were limited because of a debilitating heart condition. Respondent, using the "bank deposits and expenditures method" of computing income, determined that petitioner, within the meaning of section 6653(b), had fraudulently understated his gross receipts from the practice of medicine for each of the three years in issue. As to the years 1962 and 1963, petitioner claimed that the otherwise unexplained bank deposits uncovered by respondent's reconstruction of income were attributable to the aforementioned cash hoard which petitioner brought with him to this country. As to the year 1961, petitioner urged that respondent's reconstruction of income was largely inaccurate as a result of various computation erros made by respondent's agent. 857 Petitioner also urged that respondent was foreclosed from employing the "bank deposits and expenditures method" *123 as a supplemental means of computing income, since, on their face, petitioner's books and records gave every indication of being both complete and accurate. Held: For each of the years in issue, respondent failed to prove by clear and convincing evidence that petitioner, within the meaning of section 6653(b), fraudulently understated his gross receipts from the practice of medicine. Held, further: Respondent's deficiency determination for the years 1962 and 1963 was correct only to the extent that petitioner failed to sustain his burden of proof with regard to certain disallowed business expense deductions. Held, further: Respondent's deficiency determination for the year 1961 was correct only to the extent that petitioner failed to sustain his burden of proof with regard to (a) certain disallowed business expense deductions and (b) a portion of respondent's reconstructed gross receipts computation. Held, further: Respondent was not foreclosed from using the "bank deposits and expenditures method" of reconstructing petitioner's income. Irving D. Labovitz, for the petitioners. Rufus E. Stetson, Jr., for the respondent. IRWIN
*124 Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined deficiencies in petitioners' income tax and additions thereto pursuant to section 6653(b) [1] for the following years: Year
Deficiency
Additionsto Tax
1961
$1,829.99
$ 915.00
1962
4,137.25
2,068.62
1963
3,302.98
1,651.49
The issues for decision are: (1) *125 Whether the petitioners failed to report taxable income in the amounts computed by the respondent for each of the taxable years 1961 through 1963; (2) Whether petitioners were entitled to the disallowed deductions claimed on their income tax returns for the taxable years 1961 through 1963; (3) Whether petitioners filed false and fraudulent income tax returns with intent to evade taxes for any of the taxable years involved, so as to make the additions to tax under section 6653(b) applicable; and (4) Whether respondent, in the absence of incomplete or inadequate records of the petitioners, acted properly in going beyond petitioners' books and records for the taxable years in question and reconstructing petitioners' income for such years through use of the "bank deposits and expenditures" method. Findings of Fact Petitioners Eugene F. and Leah Snyder (hereinafter referred to as Snyder and his wife) are husband and wife and were residents of Miami Beach, Fla., at the time their petition herein was filed. Both of petitioners are doctors of medicine, although the record indicates that Snyder's wife at no time during the years in issue derived any income from the practice of medicine. *126 Snyder and his wife filed joint income tax returns for the years 1961, 1962 and 1963 with the district director of internal revenue, Boston, Mass. It is only by virtue of the fact that Snyder's wife's name appears on these joint income tax returns that she is a petitioner in this proceeding. Petitioners came to the United States in 1939. Their journey to this country had its origin in Russia where both Snyder and his wife were successful doctors. After leaving Russia, petitioners next located in Czechoslovakia and finally were able to obtain passage to the United States. Snyder and his wife settled in Chicopee Falls, Mass. Snyder's wife was 41 years old at that time and Snyder was about the same age. Petitioners purchased a home in Chicopee Falls shortly after their arrival in this country. For the years herein relevant, no mortgage existed on this family residence. 858 Soon after their arrival in Chicopee Falls petitioners deposited a total of $9,000 in three separate savings accounts. Also, at that time, petitioners embarked upon an extensive investment program which has yielded substantial returns over the years. For the years relevant to our inquiry, petitioners reported *127 income from the receipt of dividends and interest as follows: Year
Dividends and Interest Income Reported on Tax Returns
1961
$8,719.49
1962
8,207.06
1963
9,142.40
Snyder's medical practice for the years with which we are concerned was limited to office visits and occasional trips to the hospital. For these years Snyder's professional activities were severely curtailed because of several heart attacks and because of a general deterioration of his health. He was precluded from performing any surgery of a major variety. Snyder's tax returns for the years in question reflect the effect which his poor health had on the extent to which he was able to pursue his career. In each of the years between 1961 and 1963 Snyder's income tax returns, Forms 1040, on page 1, bore the following caption: 1961
Physician Semi-retired
1962
Semi-retired
1963
Semi-retired M.D.
Schedule C of Snyder's returns for the years in question further indicate that Snyder's activities as a physician were limited because of his ailing condition. Schedule C of his 1961 return on the line captioned "Principal business activity" indicates that Snyder was a "Physician (Semi-retired *128 because of heart attack)." Schedule C of his 1962 return on the line captioned "Principal business activity" bears a similar answer in which it is stated that the taxpayer was a "Physician semi-retired." This answer is also footnoted with the following explanation: "Since suffering a heart attack, the Doctor has done very little except office calls." Similarly Schedule C of Snyder's 1963 tax return also indicated that he was a "Physician, Semi-retired." Additionally, this answer contains a footnote which states the following: "Since suffering heart attack a second one occurred in 1963. The doctor has done nothing except office calls and trips to hospital." The tax returns referred to above were prepared by petitioner's accountant, Sanford C. Plumb (hereinafter referred to as Plumb), a man of about 40 years' experience in the area of preparing income tax returns. The 1961 return was filed on February 24, 1962. The 1962 return was filed on March 2, 1963. The 1963 return was filed on March 22, 1964. Hence, all of the income tax returns in question were filed by petitioners prior to the inception of any formal examination by respondent of Snyder's professional activities for the years *129 in question. Snyder's medical diaries for the years 1962 and 1963 reveal that as a rule Snyder only accepted office calls during the morning hours and that he never worked on Wednesdays, Saturdays, or Sundays. The 1962 diary indicates that Snyder's office was closed for the months of March and October. The 1963 diary indicates that the office was not open for two weeks in March, two weeks in April, two weeks in November and for the entire month of December. A letter from the well-known Boston heart specialist, Dr. Paul Dudley White, dated December 6, 1963, and herein reproduced in part, contains the following language: I have just returned from an absence abroad and find your letter of November 25 telling of your new heart trouble. I was certainly sorry to hear it, but I am glad to know that you are in such good hands and that the prospects are favorable for you. I agree entirely with the advice to spend a good many months - at least throughout the winter - in Florida after you have recovered from the attack. Shortly after their arrival in Chicopee Falls petitioners rented a safe deposit box from a bank in the city of Springfield, Mass. They maintained this box between the *130 years 1941 and 1966 after which time petitioners moved to the State of Florida. The safe deposit box bore the following dimensions: 10inch X 4 3/4inch X 22inch. During the years between 1941 and 1966, petitioners made about 300 visits to the safe deposit box. Between 1957 and 1960 petitioners also rented a second safe deposit box which bore the following dimensions: 10inch X 7 3/4inch X 22inch. During the four-year period in which this box was held, petitioners made 22 visits to this second safe deposit box. 859 The petitioners borrowed money from banks in the following amounts: Date
Amount
July 1, 1959
[1] $ 8,582.00
November 15, 1961
8,253.60
December 13, 1961
13,000.00
In 1961 the petitioners purchased corporate stocks amounting to $35,775.15. Petitioners borrowed the sums indicated above to help finance their purchases of stock. The total amount of outstanding debt occasioned by the petitioners' bank loans as of December 13, 1961, amounted to $21,253.60. In addition to these loans petitioners also withdrew $15,789 from their savings account in 1961. Hence, the savings account withdrawals *131 coupled with the outstanding loans more than equaled the cost of the substantial investment made by petitioners during the year 1961. The petitioners consistently maintained a modest balance in their checking account during the years 1961-1963 never exceeding $3,000 and often less than $1,000. The deposits to the checking account were almost invariably in amounts of less than $1,000 and there is no discernable difference in the pattern of deposits, either as to frequency or amount, between the years 1961 and the two subsequent years. Helen Green (hereinafter referred to as Green) of Chicopee Falls was employed by the petitioners for the years in question and has been in their employ for an overall period of about 12 or 13 years. Her primary duties were to clean Snyder's office, sort out the mail, answer the phone and perform various other functions related to maintenance of Snyder's office. Snyder's office was located in the first floor of his home. This floor did not encompass any of the personal living quarters of the petitioners. Normally Green worked during the hours of 9:00 a.m. and 1:00 p.m. Whenever she had time she would go upstairs and assist Snyder's wife with her housekeeping. *132 During her years with petitioners Green was given access to that portion of Snyder's home in which their living quarters were located. Though Green was not aware of the existence of a wall safe which may have been located in the living quarters of the Snyders' home, she was, however, aware of a very heavy night stand-like piece of furniture located in petitioners' bedroom which they constantly referred to as their "safe." Green on several occasions saw petitioners place important papers and other valuable items in this "safe." She was unaware of the nature of any of these papers. Green at no time had occasion to discuss with the petitioners anything related to the amount of cash which the petitioners brought with them when they arrived in this country. Green believed that petitioners always led a modest life and though they owned two automobiles, one was very old. Petitioners' accountant, Plumb, had been preparing tax returns for petitioners since 1944. The information which he had received from petitioners, annually, was in his estimation, sufficient for purposes of computing the petitioners' annual income tax return. Plumb, in addition to being petitioners' accountant, was *133 also a good friend of the family and had visited the Snyders at the Snyders' home on several occasions prior to 1961. On the occasion of these visits Snyder more than once "bragged" about a reserve of cash which he had brought to this country from Europe. During these visits Snyder also informed Plumb that this cash was stored in a safe in Snyder's home and that the money originally represented funds which he had earned in Europe from the practice of medicine. Plumb saw no reason to dispute Snyder's statements since they were communicated to him in a friendly vein during the course of nonbusiness conversations. Plumb was first contacted by the Internal Revenue Service early in 1965. The agent assigned to the case was Richard L. LaPlante (hereinafter LaPlante) who was attached to the Internal Revenue Service's Holyoke branch. LaPlante informed Plumb that petitioners' tax returns for the years in question were to be investigated and that he (LaPlante) wished to set up a mutual audit. The audit took place on April 27, 1965. Sometime thereafter, either late in 1965 or early 1966, Plumb contacted William A. Roan (hereinafter referred to as Roan), a member of the certified public accounting *134 firm of Wilson, Mahoney & Roan and requested that Roan assume all matters relating to the audit of the petitioners' income tax returns. At a meeting attended by Plumb, Roan and Snyder (Snyder's wife may also have been in attendance), Roan agreed to assume all accounting duties related to the impending audit. The meeting took place at Roan's office in Springfield. While at the meeting, Plumb supplied Roan with all of the books 860 and records of the petitioners which he had in his possession. Roan also requested that the petitioners supply him with all other pertinent items which might bear upon their tax returns for the years in question. Roan suggested that they supply him with items such as bank statements, cancelled checks, savings books, diaries and appointment books. To the extent available, [2]Roan obtained these items from Snyder at a meeting which transpired several months later and which was held at the Snyders' home in Chicopee Falls. In the next 2 1/2 years many meetings ensued between Roan and Snyder. All of these took place in Snyder's home because he was unable to travel with any degree of consistency. While these meetings were *135 taking place, Roan had been advised by LaPlante that LaPlante had reconstructed Snyder's income for the years in question by applying a so-called "bank deposits test" in which he had determined that bank deposits exceeded gross receipts on Snyder's income tax returns. As a consequence Roan discussed this matter with Snyder at these meetings. Snyder explained these discrepancies to Roan by stating that the money had come from a cash accumulation which he (Snyder) had brought to this country. He stated that the reason for making the deposits in the years in question (1962 and 1963) was because his son was at that time planning on marriage and starting his medical career. Snyder wished to defray the costs of the wedding and various expenses related to his son's new career. Snyder and Roan also discussed the circumstances surrounding Snyder's departure from Europe in 1939. Roan was advised at that time that Snyder had been forced to flee from Europe, first from Russia and then from Czechoslovakia. He was told that both Snyder and his wife had been very successful in Europe in the practice of medicine and brought with them to this country a considerable amount of money. Roan was also *136 apprised of the fact that soon after entering the country, the Snyders purchased a home and made considerable investments in the stock market. These factors were sufficient to persuade Roan that Snyder was a doctor of substantial means. During these meetings Snyder told Roan that the money used to make the cash deposits in 1962 and 1963 had previously been kept in Snyder's home. Snyder, however, made no mention of a wall safe during these meetings. [3] Snyder also told Roan that prior to 1962 he had been keeping the money in his home in case of an emergency and because of the experiences which he had encountered while in Europe; i. c., total confiscation of all moneys kept by an individual in a private bank account. While these meetings were taking place Roan conducted his own audit of Snyder's records and, relying upon his 17 years' former experience as an intelligence agent with the Internal Revenue Service, determined that the tax returns which had been filed in each of the three years in issue correctly reflected the *137 income shown on Snyder's books and records. Roan determined that the books and records presented to him were completely adequate for purposes of conducting his internal audit and found Snyder's patient cards to be perfectly reconciled with his medical diary and cash receipts books so that there was no indication of any omission of cash receipts in Snyder's records. Based on his experience, Roan also determined that petitioners' books and records clearly reflected the income of an ailing man who was forced to carry on the kind of limited medical practice pursued by petitioner during the years in question. Saul Wilson (hereinafter referred to as Wilson), Roan's associate, has been licensed as a certified public accountant in the State of Massachusetts for over 27 years and, for the years herein pertinent, was engaged in the practice of accounting in the city of Springfield, Mass. After the petitioners passed through the initial governmental audit stages and once it was established that more would be required than mere discussions with the Government's agents on the local level, Roan and Wilson decided, as was their custom, to have Wilson take over the handling of the case. Wilson *138 first met Snyder early in 1966. The meeting took place at Wilson's office. At the meeting Wilson inquired of Snyder whether there still existed any records which had not yet been submitted to his firm. Wilson also questioned Snyder's wife with regard to the existence of any checks which might be useful for purposes of 861 supporting the disallowed deductions taken on the Snyders' income tax returns. Wilson had been told by either Roan or Snyder that the Snyders' cash reserve was first used by Snyder in 1962 and thereafter in 1963. During the course of their talk Snyder stated that the money deposited by Snyder was to be used for his son's impending marriage and medical practice. By way of history, Snyder also told Wilson that he had brought with him a considerable amount of money when he came to this country from Europe, that he had been keeping this money in a wall safe in his bedroom and that the money initially represented the savings of his entire family in Europe. Wilson was also informed by Snyder that the residual of this amount which was in existence just prior to the time of the 1962 and 1963 deposits amounted to about $25,000. During his handling of the case Wilson *139 examined Snyder's medical diary which, since Snyder was on the cash basis method of accounting, constituted the primary record of Snyder's cash receipts. As a consequence of his investigation and in conjunction with information disclosed to him by Roan, Wilson concluded that Snyder's books reflected no unreported income in any of the years in question. In light of the petitioner's abbreviated work week in the years in question, Wilson expressed surprise that Snyder's income exceeded $10,000 for the years in question. However, Wilson attributed a portion of this income to the petitioner's sale of medicine which practice he thought to be customary in small towns such as the one in which Snyder maintained his medical practice. In light of the fact that Snyder did not claim that any of the money constituting his cash hoard was deposited in the year 1961, Wilson sought to explain the discrepancy between respondent's computation of gross receipts for 1961 and the amount reflected on the petitioners' income tax return for that year by other means. Among other things, Wilson concluded that certain stock purchases made by Snyder during January 1961 indicated that the cash for such purchases *140 must have come from a prior year since Wilson's understanding of the petitioner's limited work capability indicated that he (Snyder) could not possibly have earned, during that one-month period of time, the amount of money (some $4,000) required for such stock purchases. Wilson also found that part of the purchased stock was paid for by a treasurer's check dated December 22, 1960, in the amount of $677.60. Wilson, therefore, concluded that at least this portion of the money expended for the purchase of stock could not possibly have come from petitioner's earnings in 1961 and that it was improperly included in LaPlante's computation of cash expenditures for that year. Wilson further determined that similar treasurer's checks bearing the dates January 13 and January 25, 1961, and in the respective amounts of $810.67 and $908.25 which were used in the $4,000 stock purchase could most likely be traced back to prior years' earnings and should, therefore, not have been included in cash expenditures for the year 1961. After petitioner's case was turned over to Roan and Wilson, agent LaPlante conferred with these two men extensively. During his consultations with Roan, LaPlante was provided *141 with access to all of the books and records of the petitioners, including Snyder's physician's diary, patient records and bank deposit records. Moreover, at no point was LaPlante denied access to any record or article of evidentiary material which he sought. Notwithstanding the availability of such records, LaPlante at no time examined the physician's diaries or Snyder's patient records. LaPlante also admitted that though he was apprised of the existence of the cash hoard allegedly stored by Snyder in a safe in Snyder's home, he (LaPlante) never went to petitioners' home to investigate the place where the alleged cash hoard had been kept. LaPlante was aware of the serious heart disease which had beleaguered Snyder during the years in question. LaPlante had been provided with a letter from Dr. Paul D. White, a portion of which has been reproduced hereinabove but, nevertheless, did not see fit to contact White to ascertain the nature or extent of Snyder's reduced ability to practice medicine during the years in question. Also, LaPlante, though responsible for recommending fraud proceedings against Snyder, made no effort to check with any local hospitals to ascertain the extent of Snyder's *142 in-hospital patient load nor did he attempt to contact the Blue Cross or Blue Shield authorities in the area to determine the monetary levels of Snyder's Blue Cross or Blue Shield patient load during the years 1961 through 1963. During the course of the 30 or 40 audits which LaPlante performed on the records of various physicians in the area, he had encountered situations where books and records were less complete than those of 862 the petitioner. On these occasions, he had found such books and records to be adequate and satisfactory on their face so as to preclude the necessity of further investigation. Nevertheless, LaPlante decided to broaden the audit of the petitioners' returns for the years in question. In so doing, LaPlante explored various items relating to Snyder's expenditures, both personal and business, and also constructed a schedule of the petitioners' bank deposits, both in savings and checking accounts, for the pertinent years. On the basis of LaPlante's computations, respondent determined, in part, deficiencies in income tax for the years 1961 through 1963 computed as follows: EUGENE F. AND LEAH SNYDER
Computation of Understatement of Gross Receipts
1961
1962
1963
Funds Expended:
Deposits - Business Checking Account
$18,062.38
$21,236.46
$19,300.75
Deposits - Savings Accounts [1]
4,335.37
8,255.66
3,223.70
Stock Purchases [2]
35,775.15
0
2,456.28
Payments on Notes [3]
1,000.00
5,769.17
4,000.00
Net Cash Wages Paid
3,500.00
3,564.00
3,148.00
Cash Business Expenses
500.00
300.00
275.00
Cash Personal Expenses 2,427.00
2,427.00
2,427.00
Total Funds Expended $65,599.90
$41,552.29
$34,830.73
Source of Funds:
Gross Receipts - per Return
$13,779.74
$13,565.00
$11,797.00
Gross Dividends
7,888.60
7,982.00
8,197.00
Israeli Bond Interest
195.00
195.00
195.00
U.S. Bonds Cashed
900.00
0
2,400.00
Withdrawals - Savings Accounts
15,789.61
6,869.17
2,466.05
Bank Loans 21,253.60
0
0
Total Source of Funds $59,806.55
$28,611.17
$25,055.05
Understatements of Receipts $ 5,793.35
$12,941.12
$ 9,775.68
*143 Respondent attributed the entire understatement of gross receipts for each of the years in question to additional amounts of unreported income arising from Snyder's medical practice. A summary of respondent's adjustment follows: Year
Gross Receiptsfrom ProfessionReported
Corrected Receiptsfrom Profession
Understatement
1961
$13,779.74
$19,573.09
$ 5,793.35
1962
13,565.00
26,506.12
12,941.12
1963
11,797.00
21,572.68
9,775.68
Adjustments resulting from certain disallowed business deductions yielded the following result: Year
Deducted
Allowed
Adjustment
1961
$5,277.58
$3,621.00
$1,656.58
1962
5,262.94
3,663.94
1,599.00
1963
4,060.15
2,875.00
1,185.15 Respondent then aggregated the understatements of gross receipts with the business expense adjustment. This aggregation resulted in the recomputation of income on which the deficiencies in this case and penalties applied thereon were based. Several mistakes were made *144 in LaPlante's reconstruction of petitioners' 1961 gross receipts. Specifically it appears that LaPlante failed to take into account as a source of funds $510 of mortgage interest income which amount was clearly shown on petitioners' income tax return for the year 1961. Additionally, in his computation of possible sources of income received in 1961, LaPlante included the net amount ($13,000) of a loan originally taken out by petitioners in the amount of $14,000, which amount 863 was thereafter reduced by a $1,000 payment made on the same day the loan was taken out. The net figure of $13,000 was used by LaPlante as a "source" of income while at the same time the $1,000 payment, which gave rise to the netting out of $1,000 from the original amount borrowed, was then treated as a cash expenditure in that year. The result of this error was that the petitioners were credited with $1,000 less of nontaxable income than they actually received. Several other computations made by LaPlante were also of questionable accuracy; however, these amounts were relatively minor in consequence. LaPlante's computation of annual cash expenditures for personal living requirements was not based upon *145 actuarial tables, the standard of living in the area or his own knowledge and experience; but was, instead, based on petitioners' personal records, which did not include checks which petitioners may have used to pay for a substantial amount of their personal living expenses. Had petitioners paid for some of their personal expenses by check, the effect would have been to reduce the amount of the petitioners' estimated cash expenditures for one or more of the years in question. [4]
As to the various disallowances of deductions claimed on petitioners' income tax returns, 50 percent of the money allegedly paid to Green *146 was disallowed by respondent on the ground that such payments were made for personal living expenses. Most of the deductions claimed for transportation costs were denied even though LaPlante was aware of the fact that the closest hospitals to Snyder were five to eight miles distance from Snyder's office. Gerald Cavanaugh (hereinafter referred to as Cavanaugh), a special agent with the Intelligence Division of the Internal Revenue Service, sometime during the course of the audit of petitioners' tax returns, was assigned to the case with the view toward a possible criminal investigation. Cavanaugh did not conduct a full scale investigation but, with the assistance of Roan, instead conducted a preliminary investigation so as to ascertain whether or not a criminal investigation should be undertaken. As a result of his inquiry he concluded that a criminal investigation would not be necessary and that the case should be referred back to the audit division. At no time during Cavanaugh's inquiry was he ever denied access to any of the books and records of the petitioners. Roan freely and willingly assisted Cavanaugh with his investigation even though Roan, by virtue of his 17 years with *147 the Intelligence Division of the Internal Revenue Service, was eminently aware of the import of Cavanaugh's inquiry. Both Cavanaugh and Roan visited Snyder's office and together made spot checks of Snyder's records to see if recorded receipts corresponded with the other records which Snyder maintained. On close examination Cavanaugh admitted that the spot check which he made of Snyder's books indicated that they were in complete conformity with the tax returns in question and that no unreported income existed. During the course of Cavanaugh's investigation, Snyder told him that he had brought a cash hoard of $55,000 with him to this country in 1939 and that between $12,000 and $18,000 of this money was deposited in Snyder's bank accounts during the years 1962 and 1963. Neither Snyder nor his wife appeared at the trial. The following reproduced letter was written by a Dr. Fred Wasserman, Snyder's cardiologist for all years herein in question: April 2, 1968 TO WHOM IT MAY CONCERN Re: Eugene F. Snyder, M. D. 5161 Collins Avenue Miami Beach, Florida
I hereby certify that Eugene F. Snyder, M.D., formerly of 43 Pine Street, Chicopee Falls, Massachusetts, is under my medical *148 care. He suffers from coronary heart disease with cardiac arrhythmia after a myocardial infarction, angina pectoris, and chronic congestive heart failure. Dr. E. F. Snyder was recently hospitalized in Cedars of Lebanon Hospital, Miami, Florida, suffering from a transient ischemic cerebrovascular episode. Because of his heart and cerebrovascular conditions, Dr. Eugene F. Snyder, now completely retired, should avoid stress and strain in any court procedure or 864 travel as it may be injurious to his health. His wife, Mrs. Leah Snyder, is also my patient, suffering from coronary arteriosclerosis and cardiac arrhythmia. She, also, must avoid all type of stress and has the care of her sick husband. /s/ FRED WASSERMAN, M.D. Opinion Petitioners herein are elderly people who claim that they brought a cash hoard to this country when they fled from Europe shortly before the outbreak of World War II. Our primary task in this case is to determine whether certain, otherwise unaccounted for, bank deposits made by petitioners in the years in question were attributable to this alleged cash hoard. The taxable years involved herein are 1961 through 1963. For each of these years we must *149 determine whether there was an underpayment of tax. If we hold that an underpayment of tax did in fact exist, we must also determine whether any of the tax returns evidencing such an underpayment were filed by petitioners with intent to fraudulently evade taxes. Before focusing our attention on these questions, we will first consider several preliminary matters important to the disposition of this case. We will then address ourselves to the central questions in this case, first the fraud issue and then the deficiency issue. Preliminary Issues 1. Petitioner's Failure to Testify Before commencing with our analysis of the evidence presented herein, we would like to state that our consideration of this case would have been made considerably easier had we been benefited by the testimony of either of the petitioners in this proceeding. Unfortunately, this was not possible because of the grave status of Snyder's condition coupled with the fact that his wife was forced to attend to his needs while, herself, suffering from severe heart ailments. However, in making this observation we reject respondent's contention that the absence of such testimony in the instant proceeding gives rise *150 to the presumption that, if produced, it would have been unfavorable. Cf. Wichita Terminal Elevator Co., 6 T.C. 1158 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947), and Max Cohen, 9 T.C. 1156 (1947), affd. 176 F. 2d 394 (C.A. 10, 1949). In the Cohen case at page 1162 we made the following observation: Theoretically, the taxpayer should, in a case such as this, be his own best witness. His unexplained failure to testify gives rise to a presumption that had he testified and told the truth his testimony would have been unfavorable to his cause. * * * We disagree with respondent's assertion that this language of the Cohen case is apposite to the situation we face in the instant proceeding. We believe that the letter written by petitioners' cardiologist two days prior to the date set for the trial of the case at bar is sufficient explanation for petitioner's failure to testify either in person or by way of deposition. In arriving at this determination, we recognize that the condition of Snyder's wife may have been such that the taking of written depositions would not have materially detracted from the status of her health. However, *151 in light of the letter written by Dr. Wasserman, and because of the very delicate circumstances in which Snyder's wife found herself, we believe that taking a written deposition from her would not have been a prudent course of action. [5]
2. The Bank Deposits and Expenditures Method We now address ourselves to petitioner's contention, stated at trial and on brief, that respondent improperly extended his investigation beyond the books and records of the petitioner. Petitioner states that respondent should, as a matter of law, be required to restrict his investigation of income to the books and records of the taxpayer where such books and records appear to be consistent and complete on their face. It is, therefore, contended that since the record establishes that petitioner's books and records were, in fact, consistent and complete on their face, respondent lacked authority to invoke *152 the bank deposits and expenditures method of reconstructing the income reflected by petitioner's books. 865 We cannot agree with the position taken by the petitioner on this question. The bank deposits and expenditures method of reconstructing a taxpayer's income, like the net worth method of reconstructing income, encompasses a significant degree of uncertainty. Traum v. Commissioner, 237 F. 2d 277, 280 (C.A. 7, 1956). However, like the net worth method, the bank deposits and expenditures method of recomputing income has been widely approved by the courts. Traum v. Commissioner, supra; see also Marcello v. Commissioner, 380 F. 2d 509 (C.A. 5, 1967), affirming a Memorandum Opinion of this Court; and Price v. United States [64-2 USTL 9708], 335 F. 2d 671 (C.A. 5, 1964), affirming a District Court opinion. The bank deposits and expenditures method, as utilized in this case, is intended to strike up a comparison between (a) the income reflected on the taxpayer's returns and (b) the aggregate of the taxpayer's expenditures and bank deposits for the taxable year. After this comparison has been made, sources of nontaxable *153 income, such as gifts and tax-free interest, are added to the taxable receipts reflected on the taxpayer's return. Next, items which would create a duplication on the bank deposits and cash expenditures side of the equation are deleted from this computation so as to eliminate the possibility that an item such as a withdrawal and redeposit of the same amount might distort the bank deposit's segment of the computation. Notwithstanding this procedure, the reconstructed income determined by this form of computation may suffer from a variety of possible mistakes. See, e.g., Anderson v. Commissioner, 250 F. 2d 242 (C.A. 5, 1957), certiorari denied 356 U.S. 950 (1957). Petitioners have construed the possibility that mistakes may inherein the respondent's computation of income through the bank deposits and expenditures method as something which must necessarily yield a conjectural result and must, therefore, be rejected by this Court. Though we acknowledge that proof of unexplained bank deposits, without more, may not of itself supply the respondent with the clear and convincing evidence indispensable to the satisfaction of the respondent's burden of proof in a *154 question of fraud, we cannot, however, agree with the petitioner that a mistake in such a computation automatically devalutes the respondent's computation to the level of conjecture. See, e.g., Marcello v. Commissioner, supra, where it was said at p. 511: The "bank deposits plus expenditures" method was an appropriate method to reconstruct income. Furthermore, there is no arbitrariness simply because the Commissioner erred in some of his choices as to what constituted income. Finally, the taxpayers have the burden to show that various deposits and expenditures do not represent income and that particular items should be allowed as credits against income. * * * [Footnotes omitted.] In view of the recognition given to the propriety of the bank deposits and expenditures method by this Court and many other courts and in view of the fact that this method of recomputing income lacks exactitude for many of the reasons which also make the net worth method of recomputing income something less than a precise science, it is our belief that the former method should be governed by those court developed principles which have been applied to the latter. This being the case, we believe *155 it appropriate to discuss those cases which have guided us in concluding that the bank deposits and expenditures method of reconstructing income, like the net worth method, may be used by the Commissioner and his agents even when the books and records of the taxpayer appear to be both complete and internally consistent. In Holland v. United States, 348 U.S. 121 (1954), it was asserted by the taxpayer that the net worth method of recomputing income is confined to those situations where the taxpayer has no books or where his books are inadequate. In response to this argument the Supreme Court, in holding that there were no preconditions to the use of the net worth method of recomputing income, stated at page 132: Certainly Congress never intended to make § 41 [6] a set of blinders which prevents the Government from looking beyond the self-serving declarations in a taxpayer's books. * * * To protect the revenue from those who do not "render 866 true accounts," The Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books accurately reflects his financial history *156 This rule of the Holland case has become the fons et origo of the law concerning the use of the net worth method of income reconstruction. Schwarzkopf v. Commissioner, 246 F. 2d 731, 733 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court. Summarizing the rationale of the rule established in the Holland case is Davis v. Commissioner, 239 F. 2d 187 (C.A. 7, 1956), affirming a Memorandum Opinion of this Court, certiorari denied 353 U.S. 984 (1957), in which it was said: The Supreme Court has expressly held * * * that the net worth method is not confined to situations where the taxpayer has no books or where his books are inadequate. Holland v. United States * * *. Taxpayer obviously overlooks the fact that the net worth technigue of computing income is not a method of accounting. It is no more than proof of income by circumstantial or indirect evidence. * * * The fact that the taxpayer's books and other records are consistent with his income tax returns or are internally consistent proves nothing more than that they are consistent; it does not establish that they are truthful or accurate. * * * In short, the apparent adequacy *157 of the taxpayer's books is the very thing that the net worth method attacks by independently demonstrating the receipt of unrecorded and unreported taxable income. * * * In conclusion, we believe that the rationale cited above should apply to the bank deposits and expenditures method with the same force that it applies to the net worth method. In so holding, we believe that the following language (as we have modified it) which appears in Morris Lipsitz, 21 T.C. 917 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955), a net worth method case, is determinative of the question in the instant proceeding: [7]
[The bank deposits and expenditures method] is not a system of accounting; it is not a substitute for either the cash or the accrual basis of accounting or any other recognized method of keeping books. When correctly applied to the facts of *158 a particular situation it is merely evidence of income. * * * It is not correct to say that the use of the method is forbidden where the taxpayer presents books from which income can be computed, for the method itself may provide strong evidence that the books are unreliable. * * * Primary Issues 1. Additions to Tax for Fraud We now address ourselves to the question of whether petitioner with intent to evade taxes filed false and fraudulent income tax returns for the tax years herein involved. The existence of fraud is a question of fact. As is wont with fraud cases generally, evidence of fraud must be ascertained from the surrounding facts. William C. deMille Products, Inc., 30 B.T.A. 826 (1934); M. Rea Gano, 19 B.T.A. 518 (1930). To support a determination of fraud for any of the years in question respondent must prove fraud by "clear and convincing" evidence. Carter v. Campbell, 264 F. 2d 930 (C.A. 5, 1959); Jacob D. Farber, 43 T.C. 407, 419 (1965), reaffirmed in a supplemental opinion 44 T.C. 408 (1965). To prevail under section 6653(b), the fraud provision on which respondent relies in this proceeding, *159 respondent must bear the burden of proving fraud. [8] Moreover, in satisfying the burden of proof imposed by the statute, the respondent need only prove that some part of the deficiency for each of the years in question was due to fraud with intent to evade taxes. He need not prove the precise amount of the deficiency occasioned by the petitioner's fraudulent acts. W. A. Shaw, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). This is also borne out by the specific terms of section 6653(b). With this legal backdrop in mind, it is our conclusion and we so hold that respondent in the instant proceeding has not upheld the heavy burden required of him by the statutes and case law cited above. 867 A. Taxable Years 1962 and 1963 As stated by respondent on brief, the petitioner's sole explanation for the discrepancy arising from (a) income reported on his income tax *160 returns for the years 1962 and 1963 and (b) the income figure for these years computed by respondent through use of the bank deposits and expenditures method is that funds equivalent to this discrepancy were traceable to a cash hoard which petitioner brought with him when he arrived in this country. This defense presents a question of fact, the refutation of which has not been clearly and convincingly established by respondent. Proof that there did not exist a cash hoard prior to 1962 sufficient to offset the discrepancies in income which respondent alleges is crucial to respondent's case. To establish the nonexistence of such a cash hoard, respondent has attempted to show that petitioner's actions and financial attitudes for the years herein pertinent and for other years subsequent to petitioner's arrival in this country were inconsistent with the hoarding of a reserve of cash sufficient to offset the alleged discrepancies in income for the asserted years. The evidence does show that petitioners, almost from the time they first set foot in this country in 1939, engaged in a heavy program of investments in the securities market. The evidence also establishes that for the years in *161 question petitioners maintained relatively small balances in their checking accounts with no discernable difference for the years in question as to either deposits or withdrawals. The evidence also establishes that petitioners maintained two safe deposit boxes of average proportions for many of the years prior to the years in question. The evidence further bears out the fact that petitioners obtained several loans at interest, the principal of which amounted to $21,253.60 as of December 1961. Also indicated is the fact that petitioner in alleging the existence of a cash hoard inconsistently described the place where the cash had been kept as a "safe" on one occasion, a "wall safe" on another occasion and "in their home" on a third occasion. These facts, taken by themselves, may tend to suggest that a person with the apparent financial acumen possessed by the petitioner would surely not allow a large amount of cash to stay idle in a depository located in his home when that very same cash could be producing dividends if invested in the open market. Such evidence, taken alone, might also indicate that a person such as petitioner would not borrow amounts in excess of $20,000 at interest *162 in a given calendar year if that same amount was held in liquid form and at his ready disposal. Additionally, there exists the suggestion that an amount of money which, at minimum, amounted to $12,000, [9] might better have been kept in a safe deposit box, two of which were rented by petitioners for many years, instead of in a place suggesting the relative degree of risk associated with keeping large amounts of money in one's home. Lastly, there exists the suggestion that if petitioner maintained such a large hoard of money in his home he surely would have had clear recollection of the amount of such a hoard. Granted, many inferences adverse to the petitioner might logically be drawn from the above-presented evidence were it to be viewed apart from the other evidence before us. However, that is not the case here. Though petitioner did invest large amounts of money in the securities market, this course of conduct could easily have coexisted with another form of conduct which reflected the ingrained fears brought with him when petitioner left a society where financial acumen was at all times subject to the various perils of exposing one's wealth to *163 the view of the public eye. Even this factor would not influence us had respondent established that the petitioners maintained during the years in question a cash reserve which in contrast to their investments and other holdings was extraordinary in amount. However, this respondent has failed to do. All we know is that the amount of this reserve, at most, was around $25,000 prior to 1962. [10] This amount when compared to petitioners' equity in their home, their savings accounts, and the level of their investments, which for the years in question yielded an average annual dividend and interest income in excess of $8,500, may have constituted a small percentage of their total wealth. The suggestion that petitioners would not have borrowed at interest loans totaling $21,253.60 if they had an equivalent amount of interest-free money at their disposal fails to recognize that such conduct is quite often characteristic of investors in the stock market. The testimony of Francis C. Raidy, an employee of the bank where petitioners secured their loans and a witness called 868 by the respondent bears out the notion that people, whatever their intent, frequently *164 secure loans even when they have equivalent funds of their own. Though the borrowing of money has been held to constitute evidence in refutation of the existence of a cash hoard, see, e.g., Richard F. Smith, 31 T.C. 1 (1958), we do not feel that the money borrowed by petitioners in this case constrains us to arrive at a similar conclusion. The existence of the safe deposit boxes rented by petitioners does suggest that a ready receptacle for a cash reserve more dependable than the safe maintained in petitioner's home was in fact available and logically would have been used by a person of petitioner's leaning. However, this evidence merely evinces the notion that generally funds and valuables maintained in one's home might otherwise be better preserved in the vaults of a financial institution. It does not go so far as to establish the use to which the safe deposit boxes maintained by petitioner were being put. The record, though establishing the dimensions of the safe deposit boxes, does not establish one way or the other the extent to which these receptacles were being used for noncash items such as securities and other valuables. Furthermore, we believe that the testimony *165 of Snyder's accountant, Plumb, in which he states that Snyder on several occasions prior to 1961 boasted of a cash hoard which he maintained in a wall safe in his home more than offsets the circumstantial evidence suggested by the existence of the safe deposit boxes maintained by petitioner. We find the several descriptions used by petitioner in referring to the type of safe in which he had stored his cash reserve to be of only passing consequence. So long as a safe, or depository in the nature of a safe, did in fact exist in Snyder's home, it does not matter to us that Snyder characterized such a depository as a "safe" on one occasionn and a "wall safe" on another occasion. We are primarily concerned with the substance of Snyder's statements made to accountant, Plumb, prior to 1961 at which times Snyder boasted to Plumb that he (Snyder) had a large cash reserve which was being stored in a safe in his home. Snyder's characterization of this safe in his narrations to Roan, Wilson and LaPlante are of incidental value in that they were made after the investigation of Snyder's returns had been initiated. Moreover, it would seem that this view is shared with us by respondent's agents, *166 LaPlante and Cavanaugh, both of whom, though in a position to investigate the place where the cash reserve had been stored, declined to do so. Additionally, the testimony of respondent's witness, Green, who for many years assisted Snyder with the maintenance of his professional offices and to some extent Snyder's wife with her housekeeping chores bears further testimony to the fact that a safe or safe-like unit was kept by the Snyders in their personal living quarters. Though the record indicates that Green never had an opportunity to observe the contents of this safe, we would find it extremely unusual if someone occupying Green's position would in fact have been given access to this unit which Green believed to contain various private items belonging to her employers. In substance, therefore, we find the existence of such a safe to be perfectly credible. In addition to the arguments posted above, respondent has further asserted that the discrepancies in petitioner's stories regarding the source and the amount of the cash hoard brought with petitioners when they arrived in this country is suggestive of the likelihood that no cash hoard at all was brought to this country. Once *167 again we find ourselves at odds with the degree of importance which respondent attaches to these statements. During his pre-1961 conversations, Snyder did tell Plumb that the cash reserve brought to this country represented money which had been earned in Europe. By contrast he told LaPlante that the money originally belonged to him and his sister. The record also indicates that Snyder once told Wilson that the money belonged to Snyder's family, all of whom were doctors and scientists. This same story was later reiterated to LaPlante. We cannot deny that an inconsistency exists as to the various statements made by Snyder with regard to his cash hoard. However, we cannot conclude that these statements made by Snyder are so disparate as to warrant the conclusion that they were all devoid of realism and truthfulness. We once again point to the statements made to Plumb prior to the years in question and it is our conclusion that the facts alleged in these statements are those which respondent was obligated to disprove in order to satisfy the burden of proof required of him. This he did not do clearly and convincingly. Our 869 conclusion is further motivated by the apparent fact that *168 petitioner brought a considerable amount of wealth with him when he arrived in this country and we do not, in our opinion, feel that we would be doing violence to the facts in this case were we to decide, like Plumb and Roan, that a substantial cash reserve did originally find its way into this country with the petitioner. With regard to the amount of the cash hoard originally brought into this country and more specifically with regard to the amount which was still in existence prior to 1962 and 1963, we once again find discrepancies as to the amount which Snyder claimed to have possessed. [11] Here again we do not feel that these statements, though not exactly identical with one another, are so disparate as to yield the conclusion that no funds sufficient to offset the discrepancies in income were, in fact, available in the years 1962 and 1963. Moreover, like Snyder's statements regarding the source of the cash hoard, each of these statements was made by Snyder after the Internal Revenue Service's investigation had been initiated. The strain of his declining physical condition and the tension of the pending fraud investigation are possible rational reasons why Snyder gave more than *169 one version of his story. Under these circumstances we feel warranted in concluding that the inferences arising from respondent's evidence in this area are somewhat less than clear and convincing. In addition to the fact that respondent has failed to clearly and convincingly discredit petitioner's contention relating to the cash hoard, respondent has similarly failed to establish a likely source from which income equal to the alleged understatement of gross receipts may have been derived. Agent LaPlante, who made the recommendation that fraud penalties be imposed, testified that on no occasion did he attempt to confirm his findings by either checking with the local hospitals to determine Snyder's in-hospital patient level or by *170 checking with the local Blue Cross and Blue Shield authorities to determine the financial volume of Snyder's Blue Cross and Blue Shield patient load. We believe that such an investigation would have gone a long way, in the absence of some other likely source of income, in establishing whether Snyder's income from the practice of medicine approached the gross receipts figure determined by respondent's agent. In this regard, we cannot overlook the fact that Snyder's books were also investigated by agent Cavanaugh and that Cavanaugh found petitioner's appointment book to be in conformity with the income tax returns filed for the years in question. Also of significance is the fact that Wilson at first expressed surprise at what he considered to be the large amount of income reported by Snyder for the years of his reduced practice now in question. It was only after Wilson realized that additional income may have resulted from Snyder's selling medicine to his patients that Wilson was able to accept the fact that a man in Snyder's limited working condition could have earned the large amounts of money reflected on Snyder's income tax returns. Accountant Roan also testified that the income *171 reported on Snyder's income tax returns reasonably reflected the earnings of a physician whose professional activities were restricted to the extent of those carried on by Snyder. Finally, we have the testimony of LaPlante in which he states that his investigation of books and records of other physicians practicing in petitioner's locale had not resulted in a fraud investigation even though such books and records were less complete than those maintained by the petitioner in this case. These factors suggest that the understatement of gross receipts determined by respondent was not attributable to petitioner's failure to report additional income from the practice of medicine. We hold that the alleged understatements of gross receipts for the taxable years 1962 and 1963 were not occasioned by petitioner's fraud. We also hold that respondent has presented no evidence to show that any of the deductions for expenses attributable to travel and office help which he has disallowed for these years was due to fraud. B. Taxable Year 1961 The year 1961 presents a different problem. The record discloses that petitioner did not avail himself of his cash hoard in this year. Snyder told Roan, *172 Wilson and Cavanaugh that his reserve money was used to make bank deposits only in 1962 and 870 1963. Petitioner, therefore, cannot rely on the cash hoard defense for purposes of negativing respondent's determination that gross receipts for 1961 were understated to the extent of $5,793.35. Notwithstanding the above, it is our opinion that the return filed by petitioner for the taxable year 1961 was free of fraudulent intent. Fraud is never presumed, but must be shown by clear and convincing evidence. Kreps v. Commissioner, 351 F. 2d 1 (C.A. 2, 1965), affirming 42 T.C. 660 (1964); Archer v. Commissioner, 227 F. 2d 270 (C.A. 5, 1955), affirming a Memorandum Opinion of this Court. We hold that respondent has not met his burden of clearly and convincingly proving fraud for this year. The record indicates that respondent's agent, LaPlante, on at least two accounts erred in his computation of cash expenditures and sources of income for the year 1961. The first error was in failing to give petitioners credit for $510 of mortgage interest income which was reported on petitioners' income tax return. The second error was in failing to give petitioners *173 credit for the fross amount of a $14,000 loan which they secured during 1961 and on which a thousand dollar payment was made in that same year. In analyzing this transaction, LaPlante mistakenly credited petitioner with the net amount ($13,000) of loan as a nontaxable source of income and at the same time he treated the $1,000 payment as a cash expenditure. These two mistakes had the effect of denying petitioner credit for over $1,500 worth of otherwise accountable income, wich amount was treated by respondent as income earned and not accounted for on petitioners' tax return for 1961. Wilson's testimony regarding the substantial stock purchases made by petitioners during January 1961 provides further grounds for revising LaPlante's determination by reducing his computation of cash expenditures for that year. The stock in question was purchased by treasurer's checks [12] and cash which petitioners had withdrawn from their savings bank accounts. One of the treasurer's checks in the amount of $677.60 was dated December 22, 1960. The expenditure represented by this treasurer's checks was attributable to prior years' earnings and, therefore, would reduce the cash expenditure figure for *174 1961 as determined by respondent. Wilson also testified that his investigation of the January 1961 stock transaction established that petitioners also used two other treasurer's checks, one dated January 13, 1961, and the other dated January 25, 1961, in the respective amounts of $810.67 and $908.25. Cash in the amount of $856.39 was also used in this stock purchase. Though not certain, on balance we conclude with Wilson that in light of Snyder's limited workload, the money used to purchase the two treasurer's checks equaling more than $1,700 is also attributable to money probably earned by Snyder prior to 1961. In any event, we are not convinced that the money used to purchase these two treasurer's checks was not money earned by petitioner prior to the first month of 1961. We believe such amounts should be used to reduce respondent's cash expenditure determination for 1961. The net effect of the three cash expenditures relating to the treasurer's checks used for the purchase of stock in January 1961 is to reduce respondent's computation of unreported gross receipts for that year by an additional $2,396.52. *175 The effect of the above modifications is to reduce respondent's determination of unreported gross receipts from $5,793.35 to $1,886.83. [13] Even though this discrepancy is relatively small in contrast to the alleged understatements of gross receipts claimed by respondent for the years 1962 and 1963, we have given careful consideration to the factors which may have contributed to this variance in an effort to determine whether it may have been occasioned by fraud on the part of petitioners. Our complete review of the record including many of those factors which we have already discussed leads us to conclude and we so hold that no part of the understatement of gross receipts for 1961 as alleged by respondent was attributable to the presence of fraud. We do not find any evidence in support of respondent's contention that the amounts claimed as deductions for expenses attributable to travel and office help on petitioner's return for 1961 and subsequently disallowed by respondent were tainted in *176 871 any way by fraud. Therefore, as to the deficiency arising from such disallowed deductions, we hold that no fraud penalty under section 6653(b) will lie. 2. Deficiencies in Tax as Modified A. Understatement of Gross Receipts: Taxable Years 1962 and 1963 We have determined that respondent for the years 1962 and 1963 failed to satisfy the burden of proof required for the substantiation of a fraud penalty pursuant to section 6653(b). The resolution of this issue does not, however, relieve petitioner of the burden of proof which he must satisfy in order that the deficiency assessed by respondent may be set aside along with the section 6653(b) additions to tax. Respondent's determinations, except as otherwise provided by statute, are presumed to be correct and the burden of disproving his determinations lies with the petitioner. Rule 32, Tax Court Rules of Practice; Bryan v. Commissioner, 209 F. 2d 822, 825 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court, certiorari denied 348 U.S. 912 (1955). We hold that petitioner has satisfied his burden with respect to the alleged understatement of gross receipts for the years 1962 and 1963. *177 The reasons which impel us to arrive at this conclusion have already been set forth in our discussion of the fraud penalty assessed for these years, and we do not feel that they need be restated at this point. B. Understatement of Gross Receipts: Taxable Year 1961 We are faced with a more difficult question for the year 1961. We have determined that the evidence produced by respondent with regard to this year did not clearly and convincingly establish the existence of fraud. In arriving at this determination we pointed to certain errors made by respondent's agent in his reconstruction of the gross receipts earned by petitioner. We also concluded that cash expended on certain transactions engaged in by petitioners early in January 1961 might well have been made with money earned in a prior tax period. Granted our inclination there was to believe that most of the January 1961 expenditures were attributable to prior years' earnings. Nevertheless, just as we were unable to hold that respondent clearly and convincingly proved that the cash expenditures related to the two January 1961 treasurer's checks came from the calendar year 1961, we cannot now, in disposing of the deficiency *178 issue for this same year, state that petitioner has shown by a preponderance of the evidence that such expenditures were, in fact, attributable to pre-1961 cash sources. We, therefore, sustain the deficiency in part by holding that one did exist to the extent of the amounts used to purchase the two treasurer's checks bearing dates January 13, 1961, and January 25, 1961, in amounts of $810.67 and $908.25, respectively. We also stated in our disposition of the fraud issue for this year that a review of the entire record suggested that no fraud existed even as to the unexplained portion of agent LaPlante's gross receipts determination. [14] In our further determination of the immediate question we have once again given weight to the entire record. In particular we are keenly aware of the unstinting cooperation displayed by each of petitioner's representatives in his relations with respondent's agents. We have also given substantial consideration to the testimony of accountants Roan, Wilson and Plumb and Government agent Cavanaugh, all of whom concluded that petitioner's records were complete and reflected no omissions of income. Note is also made *179 of the various references to Snyder's poor health and limited work capability which appear on his tax returns for years 1961-1963. We also recognize that at no time did respondent's agent LaPlante ever consult with either of Snyder's physicians to determine the extent to which his severe ailments limited his work capacity. Notwithstanding these very weighty considerations, it is our belief that petitioner was in a position to produce evidence showing that the otherwise unexplained portion of agent LaPlante's "understatement of gross receipts" determination was traceable to pre-1961 earnings. Because petitioner failed to do this, we hold that a deficiency also existed in the amount of $1,886.83 - the unexplained portion of respondent's gross receipts computation. [15] This leaves for consideration the amounts represented by (a) errors made by respondent's agent and (b) the pre-1961 treasurer's check used by petitioner in the January 1961 stock purchase. We hold that petitioner has met his burden of proof as to 872 these amounts, and that no deficiency exists as to them for the taxable year 1961. C. Overstatement of Deductions: Taxable Years *180 1961-1963 We hold that petitioner has failed to establish the deductibility for expenses attributable to travel and office help for the years 1961 through 1963 disallowed by the respondent. As such respondent's deficiency assessment for the amount represented by these disallowed deductions will be upheld. To reflect the conclusions reached herein, Decision will be entered under Rule 50. Footnotes
1. All statutory references, unless otherwise specified, are to the Internal Revenue Code of 1954, as amended. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. - If any part of any underpayment (as defined in subsection (c) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a).↩
1. The 1959 loan was renewed for $8,090 on August 5, 1959.↩
2. See footnote 4, infra.↩
3. Roan testified that he did not find this omission to be unreasonable since he (Roan) at no time asked Snyder where in his home the money had been kept.↩
1. No Transfers from Checking Accounts. ↩
2. Purchased by Bank Check or Cash. No inclusion of stock purchased as a result of stock sales. ↩
3. By Cash and/or Savings Account Withdrawals.↩
4. It appears on the record that most of petitioners' checks in support of their personal expenditures were destroyed by petitioners possibly in light of the fact that Plumb never impressed them with the importance of retaining records of this nature. However, bank microfilm records of such checks were available except for a two-month period. With regard to such records, LaPlante admitted that he made no effort to check the microfilm records of the local bank in an effort to determine the recipients of personal checks drawn by the petitioners in the years in question.↩
5. Because Leah Snyder is a party to this case only by virtue of having filed joint returns with her husband for the years in question, petitioners will be referred to in the singular for the remainder of this opinion and all references will be restricted to the petitioner, Eugene F. Snyder.↩
6. SEC. 41. GENERAL RULE. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; * * *↩
7. In accord with this view see M. Hunter Brown, T.C. Memo. 1968-29, on appeal (C.A. 9, October 7, 1968); cf. Campbell v. Guetersloh, 287 F. 2d 878, 880 (C.A. 5, 1961), affirming a District Court opinion [60-1 USTC 9466↩].
8. SEC. 7454. BURDEN OF PROOF IN FRAUD AND TRANSFEREE CASES. (a) Fraud. - In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate.↩
9. See footnote 11, infra.↩
10. See footnote 11, infra.↩
11. Snyder told Wilson that "somewhere around $25,000" was still available prior to 1961 and that this money was deposited during 1962 and 1963. He told Cavanaugh that he placed between $12,000 and $18,000 in cash in his bank accounts during 1962 and 1963. By contrast Roan testified that Snyder was not able to specifically recall the amount of money which was still in existence in his cash reserve for these years, even to the nearest thousand dollars.↩
12. Though not clearly established at the trial of the instant proceedings, it is our view that the term "treasurer's" check refers to purchased instrument of exchange similar to a bank cashier's check.↩
13. The combined effect of the above corrections reduces respondent's computation of unreported gross receipts for 1961 by $3,906.52 so as to leave an unaccounted balance of $1,886.83.↩
14. See footnote 13, supra.↩
15. See footnote 13, supra.↩