ANTHONY C. LICARI and MILDRED M. LICARI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Licari v. Commissioner
Docket No. 26956-86
United States Tax Court
T.C. Memo 1990-4; 1990 Tax Ct. Memo LEXIS 4; 58 T.C.M. (CCH) 1119; T.C.M. (RIA) 90004; January 3, 1990
John W. Sunnen, for the petitioners. Margaret K. Hebert, for the respondent. *6 SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax, I.R.C. Secs. [1]
Year
Deficiency
6653(b)
6653(b)(1)
6653(b)(2)
6661
1981
$ 130,188
$ 65,094
-  - -
1982
30,469
-
$ 15,235
*
$ 3,370
1983
13,965
-
6,983
**
2,147
1984
50,062
-
25,031 ***
4,505
Petitioners concede substantial understatements of income on their joint Federal income tax returns for the years in issue. Petitioners, however, contest the amount of the understatements determined by respondent under the net worth method of proof, and petitioners contest each of the additions to tax. FINDINGS OF FACT Some *7 of the facts have been stipulated and are so found. Petitioners Anthony C. and Mildred M. Licari, husband and wife, resided in San Diego, California, at the time they filed their petition in this case. All references to "petitioner" in the singular are to Anthony C. Licari. During the years in issue, petitioner owned and operated a business that sold automobile repair equipment. Petitioner's business was conducted as a sole proprietorship, doing business as Automotive Equipment Company ("AEC"). Petitioner reported income and deductions with respect to AEC's business activities on Schedule C of petitioners' joint Federal income tax returns for the years in issue. Petitioner worked seven days a week at AEC, and he took no vacations. Mrs. Licari did no work for AEC. During the years in issue, Mrs. Licari opened bank accounts in her name with funds given to her by petitioner in the amounts of $ 20,000 and $ 50,000. Petitioners' daughter, Regina Schard, served as AEC's bookkeeper and office manager. AEC sold automotive repair equipment to customers on a cash and charge basis. AEC also sold equipment to customers under what petitioner refers to as a "lease/sale program." The *8 lease/sale program was simply a deferred purchase program with the purchaser paying a financing fee or "lease" charge on top of the stated purchase price and paying one dollar as a purchase option price at the end of the deferred payment term. Purchasers under the lease/sale program also paid late fees if payments were not timely. AEC's books and records consisted primarily of a combined cash received and sales journal ("CRSJ"), a cash disbursements journal, ledger cards, invoices, and a listing of payments received on account of credit transactions (the latter document was referred to as a "received on account" or "ROA List"). At the end of each business day, AEC salesmen prepared separate, sequentially numbered invoices for each transaction. With regard to cash transactions, the bookkeeper posted amounts indicated on the invoices to the CRSJ by entering the amount of the total cash received as a debit to cash and a credit to one of the sales income accounts. Any sales taxes reflected by the cash received were credited to sales taxes. With regard to regular charge or credit transactions, AEC used an accrual method of accounting for sales proceeds. The bookkeeper posted amounts *9 indicated on the charge sales invoices to the CRSJ generally by entering the total amount of the sales as debits to accounts receivable and by entering corresponding credits to the sales income accounts and, if applicable, by entering credits to the sales tax account. Accounts receivable ledger cards were maintained for regular charge transactions. As payments on regular charge transactions were received, debits were made to cash, and credits were made to accounts receivable. With respect to lease/sale transactions, AEC used the cash method of accounting to report sales proceeds and financing fees received. At the time lease/sale transactions were entered into, three separate documents were prepared as follows: (1) An invoice listing the retail value of the merchandise, the sales tax, and the total financing fees due on the transaction; (2) A contract setting forth the terms of the transaction; and (3) An accounts receivable ledger card on which customer payment information was recorded. Petitioner determined the amount of monthly payments due on lease/sale transactions by totaling the amount of the sales price, sales tax, and financing fees, and by dividing this sum by *10 the number of months over which payments were to be made. Customers acquired legal title to the merchandise at the end of the deferred payment term by making the $ 1 option payment. From the time they were entered into, lease/sale transactions were treated by AEC and by petitioner as sale transactions. They were not treated as leases. At the time lease/sale transactions were entered into, no amount was accrued by petitioner into an income account of the business. As explained, such transactions were accounted for generally on a cash basis. When payments were received on lease/sale contracts, petitioner personally recorded on the ROA List the proper allocation of payments between sales revenue, sales taxes, and the financing fee in accord with information reflected on the ledger cards pertaining to the lease/sale contracts. Using the information petitioner entered on the ROA List, as payments were received the bookkeeper posted payments received on lease/sale transactions to the various ledger accounts in the CRSJ. At the end of each year, the total amount reflected as sales income in AEC's CRSJ was included in AEC's gross receipts on Schedule C of petitioners' joint Federal *11 income tax return for each year in issue. At the end of each year indicated below, the balance in AEC's lease/sale accounts receivable was as follows: 1980
1981
1982
1983
1984
$ 187,768
$ 156,949
$ 148,665
$ 112,737
$ 119,562
In calculating the amount of AEC's gross receipts reported on petitioners' tax returns, petitioners did not include the balance of the charge sales accounts receivable. [2]
In the computation of AEC's year-end inventory and cost-of-goods-sold deduction with respect to lease/sale transactions, AEC used a part accrual and a part cash method of accounting. In general, as required under the accrual method of accounting as it applies to dealers in personal property, petitioners computed AEC's annual cost of goods sold by adding the cost of current year purchases to the cost of beginning inventory and then subtracting the cost of year-end inventory. Petitioners, however, calculated the amount of current year purchases *12 based on payments reflected in AEC's cash disbursements journal (i.e., petitioners used the cash method for computing the "purchases" component of AEC's year-end cost-of-goods-sold calculation). Petitioners did not include accounts payable in computing current year purchases. [3] Petitioners computed ending inventory to be the cost of merchandise physically located on AEC's business premises on December 31 of each year. [4]
On Schedule C of their tax returns for each year in issue, petitioners indicated that AEC used the cash method of accounting. Improperly *13 Recorded Transactions
Several of AEC's business transactions were not entered in AEC's books consistently with AEC's accounting methods. In various transactions, portions of payments received on lease/sale transactions were not recorded or (inconsistently with AEC's cash method of accounting for lease/sale transactions) were recorded as credits or reductions to accounts receivable, which error resulted in the omission of such amounts from reported taxable income. Late fees and purchase option fees associated with lease/sale transactions generally were not recorded in AEC's income accounts, resulting in the omission of such fees from reported taxable income. The above errors in accounting generally were attributable to the fact that petitioner, upon receipt of payments, erroneously filled out invoice or payment information relating to the payments, which information was then relied on by AEC's bookkeeper in making entries in AEC's CRSJ. Bank Accounts, Stock Purchases, and Cash Transactions
During the years in issue, petitioners maintained at least 25 different bank accounts at six financial institutions. Petitioners' total bank account balances on December 31 of *14 1980, 1981, 1982, 1983, and 1984, at each of the following financial institutions were as follows: Financial
Funds on Deposit on December 31 of
Institution
1980
1981
1982
1983
1984
BANK OF AMERICA
$ 89,478
$ 128,720
$ 107,793
$   4,603
$  29,563
CALIFORNIA THRIFT
70,000
HOME FED S & L
22,771
11,000
11,102
119,699
SAN DIEGO TRUST
31,434
91,968
144,883
EL CAMINO THRIFT
150,000
WELLS FARGO BANK
26,115
73,897
69,852
9,935
11,863
TOTAL
$ 138,364
$ 213,617
$ 290,181
$ 226,205
$ 336,309
In 1982, 1983, and 1984, petitioners purchased significant amounts of stock, as summarized below: Number of
Petitioners'
Year
Shares
Company
Cost
1982
2,000
ATI
$  5,002
1983
1,000
RCA
23,375
1983
200
Mission Ins.
7,757
1983
2,000
American Motors
21,250
1983
2,000
Pubco
1,627
1984
2,000
American Motors
10,750
1984
2,000
American Motors
8,551
1984
Am. Healial Th.
3,002
1984
3,000
Pubco
4,502
In 1983, petitioners purchased a house for $ 87,200 in cash. Petitioner and AEC maintained cash on hand only in *15 the amount of $ 4,000 to $ 5,000. Other cash was kept on deposit in financial institutions. In their net worth computations, respondent and petitioners indicate petitioners' cash on hand on December 31 of 1981, 1982, 1983, and 1984, to be $ 5,000. No credible evidence supports petitioner's claim that on December 31, 1980, he, his wife, or AEC had cash on hand of $ 50,000 to $ 80,000. Petitioners reported the following amounts for AEC's net profit on Schedule C of their joint Federal income tax returns for 1981, 1982, 1983, and 1984: 1981
1982
1983
1984
$ 11,566
$ 14,517
$ 13,868
$ 37,295
Petitioners reported the following taxable income on their joint Federal income tax returns for 1981, 1982, 1983, and 1984: 1981
1982
1983
1984
$ 36,933
$ 40,536
$ 33,848
$ 72,168
Upon audit, respondent was unable to reconcile for the years in issue the amount of funds on deposit in petitioners' bank accounts with the amount of income reported on petitioners' joint Federal income tax returns. Respondent prepared net worth computations consistently with petitioners' methods of accounting as an intermediate step in determining the correct *16 amount of petitioners' income and in order to distinguish between adjustments attributable to understatements of AEC's income occurring under petitioners' methods of accounting and adjustments attributable to respondent's changes to petitioners' methods of accounting. Respondent's net worth and expenditures computations for the years in issue, prepared consistently with petitioners' methods of accounting (namely, accrual method for all items except cash method for accounts payable and accounts receivable relating to AEC's lease/sale transactions), are as follows: December 31 of
Description
1980
1981
1982
1983
1984
ASSETS
Coin & Currency
$   5,000
$   5,000 $   5,000 $   5,000
$   5,000 Bank Balances
138,364
213,617 290,181 226,205
336,309 Depreciable Assets
262,676
256,640 243,824 250,611
251,012 Inventory
153,997
240,000 192,000 163,000
152,354 Accounts Receivable
Charge Sales
25,279
25,863 17,520 39,355
55,532 Accounts Receivable
Lease/Sales
-
- - -
- Other Assets
1,989
1,007 12,302 165,280
169,879 Total Assets
$ 587,305
$ 742,127 $ 760,827 $ 849,451
$ 970,086 LIABILITIES
Other
$ 256,863
$ 230,388 $ 179,587 $ 153,747
$ 127,866 Accounts Payable
-
- - -
- Total Liabilities
$ 256,863
$ 230,388 $ 179,587 $ 153,747
$ 127,866 Net Worth
$ 330,442
$ 511,739 $ 581,240 $ 695,704
$ 842,220 Net Worth Increase
$ 181,297 $  69,501 $ 114,464
$ 146,516 ADDITIONS TO N/W CHANGES
Personal Living Expenses
18,626 29,416 23,746
17,301 Capital Loss Not Deductible
7,958    (SUBTRACTIONS) FROM N/W CHANGES
Less-Non Taxable
-Social Security
(2,587)
-Excludable Dividends
(400)
(181)
(200)
-All Savers Interest
Exclusion
(317)
(1,588)
Adjusted Gross Income
Determined
$ 199,206 $  97,148 $ 138,210
$ 168,988 Adjusted Gross Income
Reported
$  38,933 $  46,190 $  36,547
$  74,486 Income Understatement
$ 160,273 $  50,958 $ 101,663
$  94,502 *17 As indicated above, respondent computed understatements of income using petitioners' methods of accounting of $ 160,273, $ 50,958, $ 101,663, and $ 94,502, for 1981, 1982, 1983, and 1984, respectively. Respondent bases his determination of fraud on these understatements. In determining the tax deficiencies for each year, respondent adjusted the above net worth computations pursuant to sections 446(b) and 481(a) in order to place petitioners on the accrual method of accounting with respect to AEC's lease/sale receivables and accounts payable. These adjustments to respondent's computations of AEC's understatements of income figures are reflected below: 1981
1982
1983
1984
Understatements
$ 160,273 $ 50,958
$ 101,663 $ 94,502 Sec. 446 Accounting Change
(30,714)
29,412
(41,052)
(45,071)
Sec. 481 Adjustment
82,231 Adjusted Understatements
$ 211,791 $ 80,370
$  60,611 $ 49,431 OPINION Net Worth Computations
As stated, petitioners do not dispute that substantial understatements of income were reflected on their Federal income tax returns for each year in issue. They argue primarily that respondent's net worth *18 computations are inaccurate because they do not reflect $ 50,000 to $ 80,000 in cash petitioners had on hand on December 31, 1980, and because they do not include the year-end balances in the lease/sale accounts receivable and accounts payable. Where the method of accounting used by a taxpayer does not clearly reflect income, section 446(b) authorizes respondent to reconstruct the taxpayer's income using a method of reconstruction that provides a clear and rational measure of the taxpayer's taxable income. Agnellino v. Commissioner, 302 F.2d 797, 798-799 (3d Cir. 1962), modifying a Memorandum Opinion of this Court; Rau's Estate v. Commissioner, 301 F.2d 51, 54 (9th Cir. 1962), affg. a Memorandum Opinion of this Court; Estate of Cury v. Commissioner, 23 T.C. 305 (1954). The net worth and expenditures method is an accepted method of reconstructing the income of a taxpayer. United States v. Hamilton, 620 F.2d 712, 714 (9th Cir. 1980); United States v. Hom Ming Dong, 436 F.2d 1237, 1239 (9th Cir. 1971). *19 In using this method, respondent must first establish an opening net worth with respect to the taxpayer that will serve as a starting point from which to compute subsequent increases in the taxpayer's net worth. United States v. Holland, 348 U.S. 121, 132 (1954); United States v. Hamilton, supra at 714, 715; Cefalu v. Commissioner, 276 F.2d 122, 126 (5th Cir. 1960), affg. a Memorandum Opinion of this Court. From the opening net worth, respondent determines the amount of increase in a taxpayer's net worth occurring in a given taxable year. "[T]he increase in net worth (without including any unrealized gains) during the taxable year, after making appropriate adjustments for such items as the nontaxable portions of capital gain, tax-free receipts (e.g., gifts and inheritances), depreciation, and unallowable deductions (e.g., living expenses and Federal income taxes paid), may be taken as evidence of a taxpayer's net income for such year." Lipsitz v. Commissioner, 21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955). Where the increase in a taxpayer's net worth exceeds the amount of income *20 reported on the taxpayer's tax return or is inconsistent with the taxpayer's books and records, the net worth and expenditures method provides cogent evidence that the taxpayer underreported income or that the taxpayer's books and records are inadequate, inaccurate, or false. Lipsitz v. Commissioner, supra at 931. See also Holland v. United States, supra at 121; Davis v. Commissioner, 239 F.2d 187 (7th Cir. 1956), affg. a Memorandum Opinion of this Court; Snyder v. Commissioner, T.C. Memo. 1969-173. With the possible exception of installment sale treatment that may be available for the years in issue to dealers in personal property (see discussion below), where inventories are a material income-producing factor in a taxpayer's business, the taxpayer must report sales and purchases on an accrual method in order to reflect income accurately even though the taxpayer otherwise uses the cash method. Stoller v. United States, 320 F.2d 340, 343 (Cl. Ct. 1963); Herberger v. Commissioner, 195 F.2d 293, 295 (9th Cir. 1952), *21 affg. a Memorandum Opinion of this Court; Zwyns v. Commissioner, T.C. Memo. 1954-19; secs. 1.446-1(a)(4)(i) and 1.471-1, Income Tax Regs. In Bennett v. Commissioner, 30 T.C. 114, 121 (1958), we held that respondent's net worth statement was properly prepared consistently with the accrual method of accounting where an inventory was involved despite the fact that the taxpayers filed their returns on the cash method of accounting. See also Herberger v. Commissioner, supra at 295. By consistently following, however, the taxpayer's own method of accounting in preparing a net worth statement, respondent may establish that the taxpayer's tax liabilities were underreported as a result of intentional omissions of taxable income under the taxpayer's method of accounting and not as a result of adjustments arising from respondent's changes to the taxpayer's method of accounting. Morrison v. United States, 270 F.2d 1, 4 (4th Cir. 1959), a criminal tax case. Therefore, to provide evidence showing that the taxpayer acted wilfully and intentionally in underreporting taxable income on the taxpayer's returns, respondent may *22 prepare net worth statements consistently with the taxpayer's method of accounting to isolate instances in which taxable income was underreported by the method of accounting of the taxpayer's own device and control. United States v. Vardine, 305 F.2d 60, 64 (2d Cir. 1962), also a criminal tax case; Morrison v. United States, supra at 3-4. In Vardine, the Second Circuit explained respondent's preparation of a net worth statement consistently with the taxpayer's method of accounting as follows: Thus, if the taxable income reported on [the taxpayer's] return is correct, and if no errors creep into the asset, liability, and expenditure figures used to ascertain successive years' net worth, the income computed on the net worth basis and that reported on [the taxpayer's] tax return should be the same. This is possible only if the figures used in computing net worth are keyed to the taxpayer's method of accounting. * * * [United States v. Vardine, supra at 64.] Where a hybrid or unauthorized method of accounting is used by a taxpayer, the taxpayer cannot later complain when respondent prepares a net worth statement *23 using the taxpayer's method to establish specific items of unreported income. Morrison v. United States, supra at 4. We conclude that respondent was justified in using an indirect method of proof to reconstruct petitioners' income, that respondent properly used petitioners' combination accrual and cash method of accounting in making his net worth computations for purposes of his fraud determinations, and (with the possible exception of installment sale treatment) that respondent properly used the accrual method of accounting, including appropriate section 446 and section 481 adjustments, for purposes of determining the correct income petitioners earned from AEC. On brief, petitioners argue that they now should be allowed to report income from lease/sale transactions on the installment method under section 453A, as in effect for the years 1981 through 1984. The context in which this argument is made is not completely clear. It may be that petitioners make this argument solely in an effort to avoid being required to change their method of accounting for lease/sale income from the cash method to the accrual method and thereby to avoid the $ 82,231 section 481 *24 adjustment made by respondent for 1981. Neither party has attempted to explain exactly how installment sale treatment of AEC's lease/sale income would affect the tax deficiencies determined by respondent. It appears, however, based on respondent's net worth computations, that whether the cash, the accrual, or the installment sale method of reporting AEC's lease/sale income is used, the understatements of income occurring on petitioners' tax returns are substantial and that our conclusion as to the fraud additions to tax would not be altered. In opposing petitioners' attempt under section 453A now to elect the installment sale method of reporting AEC's lease/sale income, respondent relies on section 1.453-8(a), Income Tax Regs., which required dealers in personal property affirmatively to elect the installment sale method of reporting income on a Federal income tax return filed for the taxable year of the election. Section 1.453-8(a), Income Tax Regs., however, was promulgated under pre-1980 law, and its application to years governed *25 by section 453A as enacted in 1980 is questionable. 1980 Installment Sales Revision Act, Pub. L. 96-417, 94 Stat. 2247. That statute was enacted, among other reasons, in order to make it simpler and easier for taxpayers to obtain installment sale treatment. The Senate Committee report, explaining the provisions of section 453A as they were to apply to dealers in personal property, and in anticipation of the promulgation of consistent Treasury regulations thereunder, stated as follows: It is intended that, under Treasury regulations, a failure to report the full amount of gain from sales may be treated as an election of the installment method. * * * [S. Rept. No. 96-1000 (1980), 1980-2 C.B. 507. Emphasis added.] Because AEC did not accrue in the year of sale the full amount of income under its lease/sale program, it is possible that petitioners, under section 453A, may be regarded for the years in issue as having constructively made an installment sale election. Because the parties have not adequately dealt with this issue in their briefs, we leave this issue for resolution by the parties in the context of the Rule 155 computations that will be *26 necessary in this case. Section 6653(b), Additions to Tax for Fraud
Under section 6653(b), if any part of an underpayment of tax required to be shown on a Federal income tax return is due to fraud, the taxpayer will be liable for an addition to tax equal to 50 percent of the underpayment. Respondent has the burden of proving, by clear and convincing evidence, that a portion of the underpayment for each year in issue was due to fraud. Sec. 7454(a); Rule 142(b). In order for fraud additions to tax to be imposed, respondent must show that the taxpayer acted wilfully and intentionally to evade a tax known or believed to be owing. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Stoltzfus v. United States, 398 F.2d 1002, 1004-1005 (3d Cir. 1968); Powell v. Granquist, 252 F.2d 56, 60-62 (9th Cir. 1958). The existence of fraud is a question of fact to be resolved upon consideration *27 of the entire record. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is neither imputed nor presumed. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). Fraud may be established by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Bradford v. Commissioner, supra at 307; Rowlee v. Commissioner, supra at 1123. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, supra at 223-224; Otsuki v. Commissioner, supra at 105-106. A pattern of consistent underreporting of substantial amounts of income, especially when accompanied by other circumstances showing an intent to conceal, is strong evidence of fraud. See Holland v. United States, 348 U.S. 121, 137-139 (1954); Vannaman v. Commissioner, 54 T.C. 1011, 1018-1019 (1970); *28 Otsuki v. Commissioner, supra at 105-108. Under each computation that has been submitted to us of petitioners' net worth for the years in issue, substantial understatements of income on petitioners' tax returns are established. In addition, sales income associated with various transactions was either improperly recorded in AEC's sales ledgers or was not recorded at all. As evidenced by substantial increases in the deposits to petitioners' bank accounts, in the purchase of stock, and in the purchase of real estate, petitioners had to be aware that their taxable income was substantially more than that reported on their Federal income tax returns. Petitioners contend that the understatements of income were caused in large part by inadvertent accounting errors made in computing cost of goods sold (namely, that the cost of inventory purchased in one year but paid for in the second year was included twice in the cost-of-goods-sold computation in the second year, resulting in overstatements of the cost-of-goods-sold deduction and understatements of income in the second year). Petitioners' argument, however, ignores the fact that the amount of income understatements *29 arising each year from the above particular accounting error likely was significantly if not completely offset by overstatements of income that occurred each year as a result of petitioner's failure to include in each year's cost-of-goods-sold deduction the accrued cost of current year's inventory purchases to the extent not paid for in the current year. Petitioner's erroneous method of computing AEC's cost of goods sold does not explain the understatements of income of approximately $ 400,000 that occurred over the four years at issue. Respondent has established by clear and convincing evidence that a portion of the underpayment of tax for each year was due to petitioner's fraud under section 6653(b). The liability for the fraud addition to tax under section 6653(b) is not joint and several, and respondent must establish Mrs. Licari's liability therefor independently of petitioner's liability. Meier v. Commissioner, 91 T.C. 273, 303 n.34 (1988); Stone v. Commissioner, 56 T.C. 213, 227-228 (1971). Respondent has made no credible argument as to Mrs. Licari's liability for this addition to tax. We do not hold Mrs. Licari liable for the fraud *30 additions to tax under section 6653(b). Section 6661(a), Additions to Tax for Substantial Understatements of Tax Liability
On April 11, 1986, respondent issued the notice of deficiency in this case in which respondent determined additions to tax under section 6661(a) for 1982, 1983, and 1984 determined at a rate of 10 percent of the amount of the entire underpayment of tax. At trial, respondent moved to increase the rate applicable under section 6661(a) to 25 percent, which motion will be granted. In October of 1986, section 6661(a) was amended twice, once to increase the rate imposed thereunder to 20 percent and once to increase it to 25 percent. Sec. 1504, The Tax Reform Act of 1986 ("TRA of 1986"), Pub. L. 99-514, 100 Stat. 2085, 2743, increasing the rate to 20 percent; sec. 8002, The Omnibus Budget Reconciliation Act of 1986 ("OBRA"), Pub. L. 99-509, 100 Stat. 1874, increasing the rate to 25 percent. In Pallottini v. Commissioner, 90 T.C. 498, 501-502 (1988), we held that the language of section 8002(c) of OBRA is controlling over the language of TRA of 1986. Therefore, the rate to be used in determining the amount of additions to tax in this *31 case under section 6661 is 25 percent. See also Williams v. Commissioner, T.C. Memo. 1988-368. Petitioners acknowledge that substantial understatements of their tax liabilities occurred for each year, but petitioners argue that the understatements were caused by inadvertent and unintentional accounting errors and therefore that respondent abused his discretion in not waiving the section 6661(a) additions to tax. Petitioners also argue that the application of the higher 25 percent rate to taxable years occurring before the effective date of the amendment (where assessments occur after the effective date of the amendment) represents an unconstitutional violation of petitioners' rights of due process and equal protection of the laws. With regard to petitioners' constitutional arguments, it is well established that Congress may constitutionally enact tax statutes that have retroactive application where it determines that the rate at which an old tax is applied must be modified in order to achieve a more equitable and efficient distribution of the burden of taxation. Welch v. Henry, 305 U.S. 134, 144-146 (1938); *32 Cooper v. United States, 280 U.S. 409, 411-412 (1930); Brushaber v. Union Pacific R. Co., 240 U.S. 1, 20 (1916); DeMartino v. Commissioner, 88 T.C. 583, 587 (1987). In increasing the percentage rate to be applied in computing additions to tax under section 6661(a) from 10 percent to 25 percent, Congress effected an adjustment to raise revenue, to deter noncompliance, and to compensate the Government for the cost of enforcing the tax laws. Staff of Joint Comm. on Taxation, Description of Tax Penalties, at 20-24 (J. Comm. Print 1988). Application of the 25-percent rate under section 6661(a) is rationally related to a legitimate governmental purpose and does not violate petitioners' entitlement to due process under, or equal protection of, the laws. We note particularly that petitioners' understatements of income were not the result of claimed deductions or credits that were allowable when claimed but subsequently and retroactively disallowed. Here, the understatements were caused by petitioners' failure to report the correct taxable receipts from their business. Under these circumstances, we do not believe that petitioners *33 can appropriately argue that they relied on the expectation that if the understatements were subsequently uncovered and section 6661(a) additions to tax were determined, such additions would be governed by a specified rate. As explained, petitioners' error in computing cost of goods sold does not explain the substantial understatements of income reported by petitioners. The underpayments determined herein exceed the trigger amounts set forth in section 6661(a). On the record before us, we hold that petitioners are liable for additions to tax under section 6661(a) at the 25-percent rate. Section 6013(e), Innocent Spouse Provisions
Petitioner Mildred Licari argues that she is entitled to relief as an innocent spouse under section 6013(e) with respect to the entire tax deficiency determined. We disagree. Under section 6013(e), a spouse joining with his or her spouse in filing a joint return is relieved of the joint and several liability for any tax due with respect to the return provided that the spouse proves, among other things, that there is a substantial understatement of *34 tax attributable to grossly erroneous items of the other spouse (section 6013(e)(1)(B)), that he or she did not know, and had no reason to know, of such substantial understatement when he or she signed the return (section 6013(e)(1)(C)), and that after a consideration of all the facts and circumstances, it would be inequitable to hold him or her liable for the deficiency in tax attributable to the substantial understatement (section 6013(e)(1)(D)). Sec. 6013(e), [5] as amended by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801-802 (1984-3 C.B. (Vol. 1) 309); Flynn v. Commissioner, 93 T.C. 355 (1989), Court reviewed; Purcell v. Commissioner, 86 T.C. 228, 235 (1986), affd. 826 F.2d 470 (6th Cir. 1987); Sonnenborn v. Commissioner, 57 T.C. 373, 381-383 (1971). In deciding *35 whether a taxpayer claiming innocent spouse status had reason to know of the substantial understatements, the standard to be applied is whether a reasonably prudent person with knowledge of the facts possessed by the person claiming innocent spouse status should have been alerted to the possibility of substantial understatements. Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court; Mysse v. Commissioner, 57 T.C. 680, 697-699 (1972). During the years in issue, the substantial increases in petitioners' bank account balances, the securities purchased, and the assets purchased with cash, gave or should have given Mrs. Licari knowledge that the income reported on the joint Federal income tax returns was greatly understated. On the facts before us on this issue, Mrs. Licari is not eligible for relief as an innocent spouse under section 6013(e). Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. * 50 percent of the interest due on $ 30,469. ** 50 percent of the interest due on $ 13,965. *** 50 percent of the interest due on $ 50,062.↩
2. At the end of each year indicated, the balance in AEC's charge sales accounts receivable was as follows: ↩
1980
1981
1982
1983
1984
$ 25,279
$ 25,863
$ 17,520
$ 39,355
$ 55,532
3. At the end of each year indicated, the balance in AEC's accounts payable attributable to inventory purchased was as follows: ↩
Date
Accounts Payable
December 31, 1980
$ 42,316
December 31, 1981
52,586
December 31, 1982
22,448
December 31, 1983
41,952
December 31, 1984
90,479
4. At the end of each year indicated, amounts reflecting AEC's year-end physical inventory which were used in computing AEC's cost of goods sold on petitioners' tax returns were as follows: ↩
1980
1981
1982
1983
1984
$ 153,997
$ 240,000
$ 192,000
$ 163,000
$ 152,354
5. The Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801-802 (1984-3 C.B. (Vol. 1) 309), amended section 6013(e)↩ retroactively to all years to which the Internal Revenue Code of 1954 applies.